**UNITED STATES of America,**

v.

**Sylvia E. JENKINS and Vincent E. Stephens, Appellants.**

**Nos. 89–3179, 89–3199.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1991.

Decided March 29, 1991.

Rehearing and Rehearing En Banc Denied May 6, 1991.

Michele A. Roberts (appointed by the Court), for appellant Sylvia E. Jenkins in 89–3179.

Charles T. Taylor was on the brief, for appellant Vincent E. Stephens in 89–3199.

Shanlon Wu, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, and Mark J. Carroll, Asst. U.S. Attys., were on the brief, for appellee. Helen M. Bollwerk and Kevin A. Ohlsen, Asst. U.S. Attys., also entered appearances for appellee.

Before SILBERMAN, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Sylvia E. Jenkins stands convicted after a jury trial of conspiring to possess with intent to distribute cocaine base (21 U.S.C.

§§ 841(a), 846), possession with intent to distribute cocaine base and cocaine (21 U.S.C. § 841(a) and (b)), and knowingly and intentionally maintaining a place used for manufacturing, storing or distributing illegal drugs (21 U.S.C. § 856). She was tried with co-appellant Vincent E. Stephens, who was also convicted of the conspiracy and possession counts, as well as distribution offenses, and with her son, Trevor P. Eccleston, whose appeal has been ordered to be heard separately. Jenkins challenges the sufficiency of the evidence and the district court's ruling admitting evidence despite her objection under Rule 404(b) of the Federal Rules of Evidence. Stephens also contends that the evidence against him was insufficient and that other rulings of the district court were in error.

Stephens sold an eighth of an ounce of cocaine to two undercover officers on January 11, 1989, gave them his business card, and the next evening sold them another ounce and a half of cocaine. The officers paid Stephens a total of $1,900 in marked bills; some of this money was recovered from his person and a car he used. Both drug transactions took place a few blocks from Jenkins' residence at 4368 Varnum Place. Stephens had indicated to the officers that he was in partnership with others, whom he did not name. When the officers met him at 9:15 P.M. on January 12th, Stephens said he had to "go around the corner to the house and get the dope." While the officers waited, Stephens drove to Jenkins' home, entered and then returned to the officers with the drugs. After the sale, Stephens went back to the Varnum Place residence. While Stephens was inside, an unidentified male walked out of the house and drove away. Stephens then departed.

Thereafter, officers arriving at 4368 Varnum Place found Trevor Eccleston standing inside the open front door with two other men. The officers detained the three men in the living room. Eccleston said his mother, Sylvia Jenkins, was upstairs. The officers brought her down to the living room and asked if they could search her house. Jenkins agreed. As a precaution, the officers obtained a search warrant for a room on the second floor where Jenkins said Eccleston lived.

A thorough search of the premises uncovered cocaine, cocaine base, scales, packaging material, ammunition and firearms. The evidence came from locations throughout the house and the adjacent patio. A cassette tape case containing four rounds of .38 calibre ammunition sat on a dresser in Jenkins' bedroom. A shelf in the closet in Eccleston's bedroom held 12-gauge shotgun shells, .38 calibre ammunition, and a scale. A space above the closet contained a box of ziploc storage bags and some cocaine. The seizing officer, who was 6'4" tall, had to stand on a chair and crawl over the shelf to reach these items. The closet in the other upstairs bedroom held ziploc bags containing cocaine residue. On the floor by the closet were plastic vials. On top of a wall cabinet in the kitchen the officers found a clip with 12 rounds of 9 mm. ammunition. The seizing officer, who was also 6'4" tall, stood on a kitchen chair to reach the ammunition, which he could not otherwise have seen. On the kitchen counter were plastic bags and a computerized scale. On a cutting board on the counter were small, "rocklike" pieces of cocaine. A microwave oven in the kitchen contained splatters the size of match heads that tested positive for cocaine though they looked like overcooked food. The officers also seized cocaine from a safe in the basement and a 12-gauge shotgun and an M1 rifle from a brown paper bag inside a barbecue grill on the back patio. The barrels of both weapons had been shortened.

In all, 95 grams of cocaine base with a street value of $12,660, and 48 grams of cocaine powder with a street value of $11,500, were recovered during the search. This material and other items seized from Jenkins' house were introduced into evidence and the jury heard testimony about where they had been found. The government also called an expert witness who explained the presence of the weapons and ammunition. Large quantities of cash and drugs are inviting targets for thieves. Drug dealers cannot call on the police for protection so they resort to self-help with

their own firearms, which are also useful for keeping underlings in line. The government's expert also explained the presence of cocaine in the microwave oven. This indicated that the oven had been used to transform a liquefied mixture of cocaine and other substances into a hardened form commonly known as "crack." The amount of cocaine base or "crack" found in Jenkins' home was enough to make up 600 bags of the customary weight sold on the streets.

Stephens and Jenkins took the stand in their defense. Little need be said about Stephens' testimony. The government's evidence showed that after leaving Jenkins' house on January 12th, Stephens eluded the police by abandoning his car and escaping on foot. His basic pitch at trial was that the police had the wrong man and that someone had stolen the car earlier in the day. He was at pains to explain why, if this were so, the police were in possession of his handwritten business card one day earlier, on January 11th.

 Mere recital of the evidence shows that, with regard to Stephens, any "rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). The sufficiency of the evidence of Jenkins' guilt presents a closer issue. Everything turned on her knowledge of the drugs. She testified that she had lived in the Varnum Place house since 1981 and that in January 1989 three other people were also living there. She was employed as a secretary for a federal agency in Bethesda, Maryland, and had worked for the federal government for 30 years. On January 12, 1989, Jenkins said she left home at 6:45 A.M., worked until 8:30 P.M., spent an hour having dinner with her co-workers at a restaurant in Bethesda and then visited her mother and her sister before returning home. She had just walked through the door and gone directly up the stairs to her room to answer the phone when the police arrived.

Jenkins denied having ever seen Stephens before the trial began. She claimed that she generally left the house early and returned late, eating most of her meals out. She denied having ever seen cocaine or drug paraphernalia in the house or weapons in the barbecue. She had not gone into the kitchen on the evening of January 12th and had not seen the scale on the counter or fragments of cocaine on the cutting board. She had last used the microwave oven three or four days before, to make oatmeal for her grandson. She did not then notice cocaine in the microwave.

As to the conspiracy charge, Jenkins points to the absence of any direct evidence that she knew Stephens or was home on January 12th when he visited. But there is no requirement that each conspirator know the identity of every other conspirator. It is enough that "each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities." *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). Jenkins was closely associated with the other alleged conspirator, Eccleston. Stephens was observed entering the house on January 12th for the purpose of retrieving the cocaine he then sold to the undercover officers. From these facts a rational jury could conclude that Stephens was part of a conspiracy being run out of the house and that when Stephens told the officers that "we" always had cocaine to sell he meant to include those involved in drug dealing at Jenkins' house.

This still leaves the question whether the evidence was sufficient to prove that Jenkins was involved. Obviously, the jury did not believe her when she denied knowing what was going on in her home. Credibility determinations may rest on a witness's demeanor and, for that reason, are for the jury, not us. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In theory, Jenkins' testimony could have satisfied the jury not only that she was lying, but also that the truth was the opposite of what she claimed. *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (L. Hand, J.). Other courts of appeals, notably the Second and Ninth Cir-

cuits, take this into account in considering whether sufficient evidence exists to support verdicts in criminal cases. *E.g., United States v. Sliker,* 751 F.2d 477, 495 n. 11 (2d Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985); *United States v. Marchand,* 564 F.2d 983, 986 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Jenkins,* 510 F.2d 495, 499 (2d Cir.1975); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *United States v. Kenny,* 645 F.2d 1323, 1346 (9th Cir.1981), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Chase,* 503 F.2d 571, 573 (9th Cir.1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975); *United States v. Cisneros,* 448 F.2d 298, 305–06 (9th Cir. 1971); *see also United States v. Scher,* 476 F.2d 319, 321–22 (7th Cir.1973). But the theory may be taken too far. The defendant's demeanor, although evidence, cannot be evaluated on appeal. If negative inferences, based on demeanor evidence, were adequate in themselves to satisfy a rational juror of guilt beyond a reasonable doubt, appellate courts might not be able to provide meaningful review of the sufficiency of evidence. *Compare Dyer v. MacDougall,* 201 F.2d at 269. On the other hand, if juries may legitimately "assume the truth of what [the defendant] denies" (*id.*), it is fair to ask why appellate courts should not at least treat such negative inferences as one factor to be added to the others. We would have to resolve this difficult and important question only if the other evidence fell short. We do not think it did. For the reasons that follow, we find the evidence sufficient to sustain the verdict, although just barely.

Of the various pieces of evidence against Jenkins, the most prominent were that the house was hers and that she lived there. The natural inference is that those who live in a house know what is going on inside, particularly in the common areas. Jenkins says this counts for little because others lived with her and because the cocaine in the basement safe and the cocaine in the closet in her son's room were not in plain view. But the jury was entitled to believe that the drugs were not concealed to keep Jenkins in the dark. The government's expert testified that drug dealers typically hide their stash. The computerized scale on the kitchen counter, and the cocaine pieces on the cutting board and the particles in the microwave oven, were enough to indicate to the jury that whoever had been making the "crack" did not try to hide these activities from Jenkins. From this, one might infer that Jenkins already knew what was going on in her kitchen.

Jenkins' testimony that she left early and arrived home late could have led the jury to believe that drug dealing out of her home took place only while she was away. But the inference was far from a necessary one even if the jury believed this much of what she said. Stephens had told the undercover officers that he and his partners were up all night ready to fill orders. The jury therefore could have concluded that drug dealing at the Varnum Place house routinely went on late into the night, after Jenkins arrived home from work. Evidence that on the evening of January 12th Stephens was in no particular hurry to conclude the drug sale reinforces that view. Jenkins' explanation also failed to account for the weekends or other days when she was not working.

■ This brings us to the .38 calibre ammunition found in Jenkins' bedroom. When this evidence is added we are convinced that a rational juror could find Jenkins' guilt beyond a reasonable doubt. In light of the government's evidence that drugs and guns go together, this ammunition and its location doubtless had a powerful effect, even though no .38 calibre weapon turned up. Before the jury heard about the bullets, Jenkins' counsel objected. The argument for exclusion, which Jenkins presses on appeal, rested on Rule 404(b), Fed.R.Evid.:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however,

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Jenkins asserts that possession of unregistered ammunition is a crime in the District of Columbia; that under *United States v. Bailey*, 505 F.2d 417 (D.C.Cir.1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975), the government therefore had to give notice of its intention to introduce this evidence and argue for its admissibility before placing it before the jury; and that, in any event, the ammunition should have been excluded.

Insofar as pertinent here, *Bailey* held that the trial court should rule on the admissibility of "other crimes" evidence after the government has made a proffer outside the presence of the jury. 505 F.2d at 420. Although *Bailey* predated the Federal Rules of Evidence, which do not deal with such procedural requirements, we have continued to approve the process suggested in *Bailey, see United States v. Lavelle*, 751 F.2d 1266, 1278–79 & n. 17 (D.C.Cir.), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), which has the endorsement of thoughtful commentators. 22 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5249 (1976). The problem for Jenkins is that here the trial judge did what *Bailey* contemplated. Before the government offered the ammunition in evidence and before the jury heard testimony about it, the court heard argument about its admissibility outside the presence of the jury and ruled in the prosecution's favor. It is true that the objection of defense counsel, rather than a request by the prosecution, prompted the proceeding, but we fail to see why that ought to make a difference.

■ As to the court's ruling admitting the ammunition, we think this was correct. Rule 404(b), although framed restrictively, is quite permissive. It prohibits "other crimes" evidence in but one circumstance. Under Rule 404(b), evidence of other crimes or acts of the defendant satisfying the test of relevancy in Rule 401 may be admitted unless the purpose is to prove the defendant's actions were in conformity with his character. This is thoroughly explained in Judge Edwards' opinion for the court in *United States v. Miller*, 895 F.2d 1431, 1436 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990), which carefully analyzes Rule 404 and its interpretation in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). In this case, the ammunition was not admitted for the purpose of proving Jenkins' character and the prosecution in its closing argument did not attempt to place it in that light. As we have noted, the government's expert witness informed the jury that those who deal in drugs typically keep firearms for protection. Weapons are, in short, "tools of the trade" and the government introduced the bullets found in Jenkins' bedroom to prove that she was engaged in the trade. *United States v. Payne*, 805 F.2d 1062, 1065 (D.C. Cir.1986).

■ With respect to Stephens' separate contentions, none warrants extended discussion. We have already rejected his sufficiency-of-the-evidence claim. He contends that he was entitled to a separate trial on the ground that the evidence against his co-defendants was overwhelming compared to the evidence against him. Our review of the record shows that the reverse is true. His last argument is that the district court should have found a conspiracy before admitting his statements that "we" always had cocaine for sale. But these statements were admissions, not hearsay. Fed.R.Evid. 801(d)(2)(A). In any event, the district court could have considered the statements in determining whether a conspiracy existed. *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987).

*Affirmed.*