UNITED STATES of America, Appellee,

v.

Trevor P. ECCLESTON, Appellant.

Nos. 89–3200 and 91–3138.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1992.

Decided April 24, 1992.

Thomas W. Ullrich, Washington, D.C. (appointed by the Court), for appellant, Trevor P. Eccleston, in Nos. 89–3200 and 91–3138.

Shanlon Wu, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, and Mark J. Carroll, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee in Nos. 89–3200 and 91–3138. Helen M. Bollwerk and Kevin A. Ohlson, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellee.

Before: RUTH BADER GINSBURG, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG:

A jury convicted Trevor P. Eccleston of narcotics and firearm offenses.[1] Eccleston argues on appeal that the evidence was insufficient to sustain the convictions; he further maintains that inadmissible hearsay testimony, elicited by the prosecutor from a police officer, incurably prejudiced his right to a fair trial.[2]

We conclude that the evidence against Eccleston, viewed in the light most favorable to the government, was just barely sufficient to sustain the verdict. The im-

---

1. Eccleston was convicted of conspiracy to possess with intent to distribute cocaine base, possession with intent to distribute cocaine and cocaine base, and possession of unregistered firearms. The jury acquitted him on two counts of using and carrying a firearm during and in relation to a drug trafficking crime. Eccleston received concurrent sentences totalling 151 months incarceration, followed by five years of supervised release.

2. Eccleston further argues that he was denied the effective assistance of counsel, that he should have been tried separately from his co-defendants, and that he was improperly sentenced. Because our disposition necessitates a new trial, we do not reach these remaining issues.

proper hearsay testimony of the police witness spoke directly to Eccleston's involvement in narcotics distribution. Although the district court instructed the jury to disregard the statement, we are convinced, given the frailty of the government's case, that the instruction was inadequate to cure the highly prejudicial impact of the officer's testimony. Because we conclude, upon a thorough review of the entire trial record, that the district court abused its discretion in denying Eccleston's motion for a mistrial, we reverse his convictions.

## I.

The charges against Eccleston arose from two undercover drug purchases from Vincent E. Stephens in January 1989, which led to a search of 4368 Varnum Place, N.E., the home of Eccleston's mother, Sylvia E. Jenkins.[3]

Stephens sold an eighth of an ounce of cocaine to two undercover officers for $250 in marked police funds on January 11, 1989. During the encounter, the officers expressed an interest in purchasing larger quantities of drugs. Stephens indicated that he was in partnership with unnamed others and that he "and [his] people" would be able to meet any demands. The officers asked Stephens if he could arrange a sale for the following night, and Stephens told them to contact him at his pager number, which he provided on a card bearing his name.

The next evening, the officers called Stephens on his pager and arranged a second transaction. Upon meeting with Stephens, the officers asked to purchase an ounce and a half of cocaine. Stephens did not have the drugs with him, and told the officers that he had to "go around the corner to the house and get the dope." The undercover officers transmitted a description of Stephens and his car over police radio. Officer Mark McClure, who received the

transmission, followed Stephens to Varnum Place and observed Stephens first enter, then, a few minutes later, exit from a townhouse numbered 4368 Varnum Place. Stephens returned to the location of the undercover buy and exchanged an ounce and a half of cocaine for $1650 in marked bills.

Officer McClure remained parked on Varnum Street and soon observed Stephens return to the same residence. While Stephens was inside, McClure and other members of a police surveillance team saw an unidentified male leave the house and drive away. This person was never apprehended, and his car, described as a silver Nissan, was not located. Stephens departed a short time later and led the police on a chase, during which he abandoned his car and got away on foot, but was eventually caught and arrested.

Meanwhile, police prepared to search 4368 Varnum Place. Upon arrival at the residence, the officers found Trevor Eccleston, then nineteen years old, standing in the open doorway of the house, followed by two or three other men on the walkway leading to the door. All were dressed in heavy winter outerwear. The police detained the men in the living room. An officer searched Eccleston, but recovered no drugs, weapons, ammunition, or packaging paraphernalia from his person. The officer seized a total of $783 from the pockets of Eccleston's coat, but none of that money matched the marked police funds used in the two cocaine purchases.

Police testified that upon inquiry, Eccleston stated that he lived at the house, and that his mother was upstairs. The officers found Jenkins in her bedroom on the second floor, and she consented to a search of her home. According to police testimony, when asked whether anyone else lived in the house, Jenkins responded, "Yes, my son, Trevor," and identified a bedroom

---

3. Eccleston was tried jointly with co-defendants Stephens and Jenkins. All three appealed their convictions. Pending appeal, Eccleston moved to vacate or set aside his sentence pursuant to 28 U.S.C. § 2255, claiming that his trial counsel had been ineffective. This court severed Eccleston's appeal from those of his co-appellants,

and subsequently consolidated Eccleston's direct appeal with his appeal from the district court's denial of relief under section 2255. This court affirmed Stephens' and Jenkins' convictions in *United States v. Jenkins*, 928 F.2d 1175 (D.C.Cir.1991).

down the hall as "Trevor's room." Rather than rely on Jenkins' consent to search the entire house, the police obtained a separate warrant for the identified bedroom.

The police discovered cocaine, cocaine base, scales, packaging material, firearms, and ammunition in locations throughout the house and the adjacent patio. In the bedroom identified as Eccleston's, police found 12–gauge shotgun shells, .38 calibre ammunition, and a scale on a closet shelf. An attic crawlspace accessible through the closet contained a box of ziploc storage bags and three bags containing cocaine and cocaine base. *See United States v. Jenkins*, 928 F.2d 1175, 1177 (D.C.Cir.1991) (setting out evidence found during search of the house).

The police also recovered from the room two photographs of Eccleston found fastened to the wall, and a few pieces of mail addressed to him at 4368 Varnum Place.[4] On top of a television in the room, the officers found a wooden nameplate bearing Eccleston's name. Above the closet hung the astrological sign of Aquarius, corresponding to Eccleston's birth date. The room contained a couch and a television, but no bed, blankets, pillows, or bed linens. In the closet police found a few items of men's clothing, described as a jacket, a couple pairs of pants, one or two jogging suits, and perhaps some shirts. The seizing officer called the collection of clothes "just part of a wardrobe."

Eccleston's defense at trial centered on his claim that he no longer lived with his mother at 4368 Varnum Place in January 1989, when the undercover purchases and the search occurred. According to Eccleston, he had moved out of his mother's home upon graduating high school the pre- vious summer, and in January 1989 was sharing an apartment in Hyattsville, Maryland with a roommate. Eccleston accounted for his whereabouts on the night of January 12, 1989, and stated that at around 11:00 p.m., he and his friend Wayne Tucker were just arriving to visit his mother when the police search team appeared.[5] Eccleston testified that he had last visited his mother's home on January 9, 1989, and had not been at the Varnum Place house earlier that evening or the previous day. He denied any involvement in the charged offenses.

Carolyn Davis, Jenkins' sister and Eccleston's aunt, was a frequent visitor to the Varnum Place residence and testified for the defense. Davis identified several boarders who had lived at 4368 Varnum Place at various times, and named additional others who had keys and access to Jenkins' home.[6] Davis corroborated Eccleston's testimony that he had moved out of the house and in January 1989 was living in an apartment in Hyattsville. When living with his mother, Davis testified, Eccleston had occupied the bedroom identified as "Trevor's room," which had then contained a bed and dresser. After Eccleston moved out, Davis said, the bed and dresser were replaced with a sofa and television, and the room, still referred to as "Trevor's room," served as a TV room for boarders.

Jenkins testified on her own behalf. Curiously, neither the prosecution nor the defense directly asked Jenkins whether her son was living at her home in January 1989. Nor was Jenkins asked to confirm or deny the testimony of police witnesses that she had told them on the night of the search that her son lived with her. When asked who lived at the Varnum Place resi-

---

4. One of the seized letters was a solicitation for purchase from Sterling Optical dated January 1985, four years before the search. Another envelope, containing correspondence from C & P Telephone about call-waiting service, was dated December 1987, over a year before the search. The police recovered from Jenkins' bedroom a third envelope from Perpetual Bank addressed to both Jenkins and Eccleston at 4368 Varnum Place. The envelope contained a check for 51 cents, made out to either Jenkins or Eccleston, dated March 31, 1985.

5. Eccleston's account of his movements on the night of January 12 was corroborated by his father, Trevor Eccleston, Sr., and his friend, Wayne Tucker.

6. Davis' testimony in this regard was bolstered by the introduction of several pieces of mail addressed to identified boarders at 4368 Varnum Place.

dence in January 1989, however, Jenkins identified several individuals who were either staying at the house on a temporary basis or visiting regularly at that time, all of whom had keys and free access. Jenkins did not mention her son as among those living at 4368 Varnum Place in January 1989. Not all the defense evidence was favorable to Eccleston on the residency issue. Eccleston's father, who did not live with Jenkins, testified that his son lived at 4368 Varnum Place in January 1989. Eccleston, Sr., who saw his son regularly, said that he had never heard about Trevor moving out of the Varnum Place home to an apartment.

The objectionable testimony crucial to Eccleston's appeal was elicited during the government's direct examination of Officer McClure. McClure testified that he had initially joined the police chase of the fleeing Stephens, and then returned to Varnum Place to assist in the search. On his way back to 4368 Varnum Place, McClure observed a car circling the block. McClure said that the car first stopped in front of the residence, then parked near McClure's vehicle. Three black males, all around 20 years old, McClure recounted, exited the car and walked toward the house. McClure said that he stopped the three men and "asked them what their interest was in 4368 Varnum Place." At no time, however, did McClure report the names of, or further identifying facts about, the three men. Although a pat-down search of the men yielded no drugs or weapons, McClure added, one of the three showed him $900. The prosecutor then asked McClure, "What else did your investigation reveal?" McClure replied, "That they were going to 4368 Varnum Place."

Defense counsel objected on grounds of irrelevance and hearsay, but the court overruled the objection. The prosecutor continued the examination by repeating the question: "After stopping these three individuals, what did your investigation reveal?" McClure responded, "That they were on their way to purchase crack cocaine from a subject named Trevor." Defense counsel again objected and moved for a mistrial, calling the statement "clearly hearsay and highly prejudicial." The court denied the motion for a mistrial and offered to instruct the jury to disregard McClure's response. While maintaining that no instruction could "remove from the minds of this jury that highly prejudicial evidence which counsel deliberately elicited from this witness," defense counsel agreed that a jury charge, "at the very least," would be necessary if a mistrial were denied.

The court then instructed the jury:

Ladies and gentlemen, I instruct you to disregard Officer McClure's last answer or response. There has been no direct testimony as to others going to the house for any particular purpose. So disregard the last answer.[7]

## II.

The government concedes on appeal that the district court correctly identified as inadmissible hearsay McClure's testimony that the three young men "were on their way to purchase crack cocaine from a subject named Trevor." At issue on appeal is whether the district court properly exercised its discretion when it simply instructed the jury to disregard the offending statement in preference to granting Eccleston's motion for a mistrial.[8]

---

**7.** Defense counsel renewed Eccleston's motion for a mistrial the following day, arguing that McClure's hearsay testimony was "so prejudicial" as to have "irreparably infected this trial," and that a mistrial was "necessitated by the government's action in eliciting testimony that they should have known was clearly irrelevant and objectionable." Counsel further expressed concern that the court's curative instruction did not adequately inform the jury of precisely which testimony should be ignored, and suggested that a clarifying instruction might "have some benefit." The court, however, thought that an additional charge "would simply exacerbate the problem rather than improve it."

During the final charge to the jury prior to deliberations, the court instructed generally: "If, as happened, after a question was asked and an answer given by the witness and the court ruled that the answer should be disregarded, you are to disregard both the question and the answer in your deliberations."

**8.** Eccleston argues that McClure's testimony violated his rights under the Confrontation Clause of the Sixth Amendment because the three puta-

■ "The decision whether to grant a mistrial generally rests within the sound discretion of the trial court, and the single most important factor in making that determination is the extent to which the defendant has been prejudiced." *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C.Cir.), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). Our own pronouncements do not elaborate on how one estimates "the extent to which [a] defendant has been prejudiced" and we have therefore looked to case law in other circuits to aid our inquiry. "In determining whether a mistrial is warranted when the court strikes testimony and then gives a curative instruction," the Ninth Circuit

> "weigh[s] the forcefulness of the instruction and the conviction with which it was given against the degree of prejudice generated by the evidence.... In fixing the degree of prejudice, the probative force of the inadmissible evidence must be compared with that of the admissible evidence which supports the verdict."

*United States v. Morris*, 827 F.2d 1348, 1351 (9th Cir.1987) (ellipsis in original) (quoting *United States v. Johnson*, 618 F.2d 60, 62 (9th Cir.1980)), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988).

The Eleventh Circuit similarly looks to the strength of the government's case in evaluating "the impact of allegedly prejudicial testimony upon a jury." *United States v. Rodriguez–Arevalo*, 734 F.2d 612, 615 (11th Cir.1984) ("Prejudicial testimony will not mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury."). The Fifth Circuit also employs a "substantial impact" analysis of prejudice, weighing the inadmissible testimony against the totality of the evidence adduced at trial. *United States v. Alfaro*, 935 F.2d 64, 68 (5th Cir. 1991) ("reversible error exists if the evidence, when viewed in the context of the whole trial, is so highly prejudicial that it would have had a substantial impact on the jurors' verdict") (citation omitted).

This Circuit, although it has not announced a "substantial impact" standard, has ruled consistently with the approach indicated by sister circuit formulations. *See Tarantino*, 846 F.2d at 1413 ("inadvertent and brief" mention of defendant's indictment in another case, five weeks before start of jury deliberations in complex two-month drug conspiracy trial, did not have "such a prejudicial effect on the jury's decision" that denial of mistrial was abuse of discretion); *McIntosh v. United States*, 309 F.2d 222 (D.C.Cir.1962) (reference to "parole officer" did not require mistrial because "the direct evidence against the defendant was so strong as to make it practically certain that the vague and indirect suggestion of some previous conviction had nothing to do with the defendant's conviction"), *cert. denied*, 373 U.S. 944, 83 S.Ct. 1557, 10 L.Ed.2d 700 (1963).

Most recently, in *United States v. Burroughs*, 935 F.2d 292, 295 (D.C.Cir.1991), this court upheld the denial of a mistrial motion grounded on a co-defendant's unresponsive hearsay testimony. The facts and analysis of *Burroughs* provide a useful contrast to the circumstances of this case. During a warranted search, police discovered Burroughs and others seated around a dining room table on which rested a large clear plastic bag containing 64 packets of crack cocaine. Police also discovered eleven bags of crack cocaine in co-defendant Carla Nelson's pockets. *Id.* at 294. Nelson claimed to have taken the eleven bags

---

tive drug purchasers are unknown and therefore were · unavailable for cross-examination. *See* Brief for Appellant at 13. Eccleston further contends that McClure's statement was inadmissible "other crimes" evidence under *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964). Because McClure's hearsay statement, although made from the witness stand, was recognized as inadmissible by the trial judge, these arguments, which relate solely to the admissibility of McClure's testimony, are inapposite. *See United States v. Burroughs*, 935 F.2d 292, 294 (D.C.Cir. 1991) (where district court struck co-defendant's unresponsive hearsay testimony and instructed jury to disregard statement, this court rejected as "inapposite" claim of Confrontation Clause violation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because objectionable response "was not allowed into evidence for any purpose").

from a purse she found on a dining room table in her apartment (the searched premises). In an unresponsive answer during cross-examination, Nelson testified that she was told the purse belonged to the defendant Burroughs. The purse Nelson described was never recovered by police, and was not introduced at trial. *Id.*

The trial court in *Burroughs* denied defendant Burroughs' motion for a mistrial, but struck Nelson's testimony about what she was told, strongly instructed the jury to disregard the hearsay statement, and explained to the jury why the remark was inadmissible. *Id.* at 294 n. 1. In the final jury charge, the court again expressly mentioned Nelson's hearsay statement and repeated the instruction to disregard the testimony. *Id.* at 294 n. 2. The jury convicted Burroughs of one count of possession with intent to distribute cocaine base, but acquitted him of possessing the drugs retrieved from Nelson's pockets. *Id.* at 295. On appeal, this court upheld the denial of the mistrial motion "[i]n view of the relatively minor impact of Carla Nelson's unresponsive and self-serving statement, and the stern nature of the trial court's admonition to the jury immediately after the statement was made and again in the final charge to the jury." *Id.*

■ The government argues that, in Eccleston's case, as in *Burroughs*, the district court properly denied the motion for a mistrial "because the risk of prejudice ... from the offending testimony was slight and any prejudice was cured" by the instruction to disregard the statement. Brief for Appellee at 27. We disagree. In contrast to *Burroughs*, the danger of prejudice here was great because of the weakness of the government's case against Eccleston. The case here was wholly circumstantial, and was entirely dependent upon the jury believing that Trevor Eccleston was living at 4368 Varnum Place in January 1989, a fact that was far from clearly established.

The physical evidence purportedly linking Eccleston to the residence was more consistent with former than current occupancy. The bed and dresser in "Trevor's room" had been replaced with a sofa and television set. The two letters addressed exclusively to Eccleston at 4368 Varnum Place were both over a year old, and no personal papers of significance were recovered from the house. Similarly, the garments discovered in the bedroom closet—a jacket, a couple pairs of pants, one or two jogging suits, and perhaps some shirts; no shoes, socks, or underwear—were not the wardrobe of a full-time resident. The few personal items remaining in "Trevor's room" were those that typically might be found in the room of a newly emancipated child who has recently moved out of his parent's home.

Nor was the testimonial evidence that Eccleston was living at the house in January 1989 overwhelming. Several police witnesses testified that Jenkins had said her son lived with her, and had identified a bedroom as "Trevor's room." One officer testified that on the night of the search, Eccleston stated that he lived at the house. Eccleston's father, who did not live with Jenkins, testified that he thought his son was living on Varnum Street in January 1989, and was unaware that his son had moved to an apartment. While these responses may have provided some basis for the jury to believe that Eccleston was living at the house when the search occurred, they might also be regarded as examples of typical familial imprecision on the residential status of young adult children. Jenkins' reference to the bedroom as "Trevor's room" may simply reflect a common parental tendency to regard a newly emptied nest as still full, particularly when the departed child lives nearby and visits frequently. Similarly, children who have recently moved out often continue to refer to their parents' abodes as "home."

The admissible evidence of Eccleston's guilt was even weaker than the quantum of proof we found "just barely" sufficient to sustain the verdict against his mother. *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C.Cir.1991). "Of the various pieces of evidence against Jenkins," we observed, "the most prominent were that the house was hers and that she lived there." *Id.*

Jenkins' convictions were sustained largely by "[t]he natural inference ... that those who live in a house know what is going on inside, particularly in the common areas." *Id.* In contrast to the uncontested fact that Jenkins owned and lived in 4368 Varnum Place, the evidence of Eccleston's residence was disputed and hardly conclusive.

Aside from the contraband found at the house, and the inadmissible hearsay testimony of Officer McClure, there was no evidence directly linking Eccleston to the charged offenses. Eccleston was in the open doorway of his mother's house, wearing a heavy jacket, when the police arrived to search on January 12. The police did not discover Eccleston in "Trevor's room," or in any of the other numerous locations in and around the house where drugs, guns, ammunition, or distribution paraphernalia were discovered. Officers found no contraband or marked bills on Eccleston's person. Co-defendant Stephens, and Stephens' wife and brother, all testified that they had never heard of Trevor Eccleston before the arrests and prosecutions in this case. Although we judge the evidence linking Eccleston to the charged offenses sufficient to sustain the convictions, it was not more than barely so.

Officer McClure's hearsay statement that three young men "were on their way to purchase crack cocaine from a subject named Trevor" was the only evidence directly tying Eccleston to drug distribution. Measured against the frailty of the government's case, the impact of this testimony was highly prejudicial. The critical question, thus, is whether the district court's jury instruction "to disregard Officer McClure's last answer" was adequate to cure the prejudice.

"We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions ... and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987)

(citations omitted). This standard, though an imposing one, essentially turns on an assessment of prejudicial impact. The Supreme Court in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), contrasted the confession of a non-testifying co-defendant directly implicating the defendant, proscribed as incurably prejudicial in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), with a redacted confession that only inferentially incriminated the defendant. *Id.* at 208, 107 S.Ct. at 1703. With regard to the explicitly incriminatory statement, the Court reasoned,

> the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton's* exception to the general rule [that jurors follow their instructions].

*Id.*

There was nothing "inferential" about Officer McClure's incriminating hearsay testimony. McClure's statement directly implicated "Trevor" in selling drugs. The impact of the testimony was "devastating," moreover, in light of the slight and circumstantial quality of the government's legitimate case. *See United States v. Gomez–Pabon,* 911 F.2d 847, 858 (1st Cir.1990) (recognizing greater "potential for improper questioning to have a 'devastating effect' ... in cases ... where the evidence of guilt is largely circumstantial"; concluding impact of improper questions impugning credibility of corroborating witness was not "devastating" where effect was cumulative of admissible evidence), *cert. denied,* —— U.S. ——, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991).

## CONCLUSION

We are satisfied that the jury could not reasonably be expected to ignore McClure's extremely incriminating but concededly inadmissible statement in assessing Eccleston's guilt. Because the attendant jury instruction was insufficient to counterbalance the highly prejudicial content of the inadmissible testimony, the district court abused its discretion when it denied Eccleston's mistrial motion. We therefore reverse the judgment of conviction and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*