# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 23, 2017          Decided May 9, 2017

No. 14-3089

UNITED STATES OF AMERICA,
APPELLEE

v.

DONNELL CREWS, ALSO KNOWN AS DONNELL C. CREWS, ALSO
KNOWN AS DARNELL C. CREWS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00372-1)

———

*Jerald R. Hess* argued the cause for appellant. With him
on the briefs was *Charles B. Wayne*.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the
cause for appellee. With him on the brief were *Elizabeth
Trosman*, *Elizabeth H. Danello*, and *David B. Kent*, Assistant
U.S. Attorneys.

Before: GARLAND, *Chief Judge*, and KAVANAUGH and
PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

2

PILLARD, *Circuit Judge*:  On September 21, 2011, three men approached Hugh Whitaker, an employee of a cash-in-transit service, as he exited a CVS in Washington, D.C.  One of the men drew a handgun and demanded the cash Whitaker had just picked up from the CVS.  Whitaker drew his own handgun and they exchanged gunfire.  Whitaker retreated into the CVS unharmed.  The three other men, one of whom had been shot, fled the scene.  The police apprehended Donnell Crews and his half-brother, Anthony James, a couple of blocks away.  After a witness identified Crews and James as two of the men who confronted Whitaker at the CVS, the police arrested them and charged them with attempted robbery.  James agreed to a plea deal and testified against Crews and another alleged co-conspirator.  Crews's first trial ended with a hung jury.  The government retried him, and the jury found him guilty.

Crews now claims that two errors in the district court's evidentiary rulings require us to vacate his conviction.  First, Crews argues the district court erred by denying his motion for a mistrial after Joseph Brennan, an emergency room nurse, testified that a gravely injured alleged co-conspirator arrived at the hospital with "brain matter that was exposed."  But the district court remedied what little prejudice Brennan's testimony might have produced by giving a curative instruction to the jury.  Second, Crews contends that the district court erred by striking the entire testimony of his sole witness, Vakeema Ensley, who, after testifying in Crews's support, asserted her constitutional privilege against self-incrimination near the outset of cross examination by the prosecution.  Crews asserts that the district court should have struck only the testimony that related to the specific line of questioning corresponding to the cross-examination questions as to which Ensley invoked the privilege.  But the record shows that Ensley asserted a blanket privilege against any further cross examination, and that Crews

made no contemporaneous objection to the evidentiary decisions the district court made in response. The district court did not plainly err by striking the entirety of her testimony. Detecting no reversible error on either point, we affirm.

## I.

According to the government's evidence, Anthony James and Appellant Donnell Crews met with two other men the evening before the attempted robbery, Kirk Dean (the brother of James's best friend) and Antwon Crowder (Dean's brother). That evening, Dean convinced James and Crews to participate in a planned robbery. The next day, Dean and Crowder met James at the home of Crews and James's grandmother. When Crews's fiancée, Vakeema Ensley, drove up in her car, Dean asked her for the keys, explaining that Crews had told him that he could drive it. At first Ensley refused, but then she surrendered the keys and stormed inside. Crews soon joined the others and the four men set off in Ensley's car, donning latex gloves during the drive. Crowder parked the car around the corner from the CVS and waited in the car.

Whitaker, an employee of Garda Cash Logistics, a secure cash-in-transit company, arrived at the CVS in an armored truck just before 11:00 am. While the driver, his co-worker James Jones, remained in the truck, Whitaker entered the CVS and accepted approximately $10,000 to be deposited. When Whitaker exited the store, three men—later identified as Dean, Crews, and James—confronted him. One of the men began to draw a gun from his waistband, but the gun momentarily slipped in his grasp, giving Whitaker enough time to draw his own handgun. The assailant fired at Whitaker, but missed. Whitaker returned fire as he retreated into the CVS, managing to shoot Dean in the jaw and elbow.

The three men then ran back to Ensley's car where Crowder was waiting for them. Despite sustaining two gunshot wounds, Dean told the others he wanted to go back after Whitaker. Crews attempted to usher Dean into the car, urging him to go to the hospital. A brief struggle ensued, as Dean tried to pull away, but Crews managed to force Dean into the car. Crowder drove away with Dean beside him. Crews and James took off on foot, with James quickly discarding his jacket, scarf, and latex gloves in an alleyway as they ran. The police apprehended Crews and James a couple blocks from the CVS. Jones, the armored truck driver, later identified James and Crews as two of the participants in the crime, and the police arrested them both for attempted robbery.

Meanwhile, Crowder raced to the hospital with Dean bleeding in the passenger seat. Traffic cameras captured a few images of the exterior of Ensley's car speeding through the neighborhood, but no other evidence revealed what happened during that ride. By the time Crowder reached the hospital, Dean had sustained another gunshot wound, this time to his head. Crowder pulled into the hospital's ambulance parking area, exited the car, used his shirt to wipe fingerprints from the door, and hurried away. Emergency room nurse Joseph Brennan discovered Dean slumped in the passenger seat in bloody clothing. At trial, the government and the defendants stipulated that Dean later died as a result of a gunshot wound unrelated to the attempted robbery—presumably the unexplained gunshot wound that he sustained while in transit from the CVS to the hospital. The police later arrested Crowder in connection with the attempted robbery. The police recovered physical evidence near the CVS and in Ensley's car, including James's jacket, scarf, and gloves, and a piece of a latex glove with Crews's DNA on the inside surface.

5

The government jointly tried Crews and Crowder. The first trial ended with a hung jury, and re-trial proceeded before the same district judge. The government called Brennan, the emergency room nurse, as a witness at both trials. At the first trial, Brennan testified that he discovered Dean in the passenger seat of the car, covered in blood, with a head wound and matted hair. But at the second trial Brennan added that he could see "brain matter that was exposed" as he examined Dean in the car. Supp. App. 234. Crowder's counsel objected. He noted that the parties had carefully avoided discussing the gunshot wound that killed Dean. He objected that Brennan's reference to exposed brain matter might appear to contradict James's testimony that, shot only in the elbow and jaw, Dean ran from the CVS back to the car. The later gunshot was not at issue in this case, but Crowder's counsel argued that the jury would erroneously infer that Dean's apparently much more serious, "drop-and-fall" head wound happened during the attempted robbery, contradicting testimony about Dean's actions after suffering lesser wounds at the CVS and prejudicing the defense. Supp. App. 237.

Having heard from all counsel and at the defense's request, the district judge agreed to address any potential confusion from Brennan's testimony by reminding the jury that Dean died from a gunshot wound unrelated to the attempted robbery. *Id.* at 237-42. After cross examination, Crews and Crowder moved for a mistrial, arguing that it would be impossible to "un-ring the bell" after the jury heard Brennan's graphic testimony. *Id.* at 241. The district judge denied the motion, but he instructed the jurors to disregard the testimony they heard "about brain matter and matted, bloody hair," and urged them not to allow sympathy or passion to affect their judgment. Trial Tr. 123-24, Feb. 20, 2014.

Crews's counsel did not attempt to rebut the government's evidence placing him near the CVS when the attempted robbery occurred. Instead, counsel suggested during his opening statement that Crews knew about the planned robbery, sought to avoid participating, but wanted to do so in a way that would not cause the others to think he had deliberately abandoned them. In support of that narrative, the defense called Crews's fiancée, Vakeema Ensley, as a witness at both trials to testify how Crews occupied himself elsewhere on the morning of the robbery. Ensley testified that, during the morning before the attempted robbery, she and Crews drove to Beltsville, Maryland to buy a part for her mother's car. While in Maryland, a surveillance camera captured Crews entering a 7-Eleven. After running the errand, Ensley and Crews drove into the District, because they both had a shift scheduled later that day with the Greater Washington Urban League where they worked. They first headed to Crews's grandmother's house. As they approached the house, Crews asked Ensley to drop him off a few blocks away to meet his brother. After she dropped him off, Ensley parked her car outside the grandmother's home, entered and left her keys on the radiator by the front door, and went upstairs to lie down briefly to wait for Crews.

During her direct examination Ensley testified that she did not know Antwon Crowder or Kirk Dean before the arrests. At the first trial, the government attempted to impeach Ensley by asking about her grand jury testimony, in which she referred to "Kirk" as Crews's friend. She explained that she only learned that Crews and Kirk Dean were friends after the police arrested Crews. At the second trial, Ensley once again disavowed any prior acquaintance with Crowder or Dean. This time, the government focused on Crowder. When the prosecutor asked Ensley if she had ever received a call from Crowder, she answered that she had not. The government then began to ask

Ensley about a recorded phone conversation between her and Crews while he was detained awaiting trial, but before Crowder had been arrested. In the recording, Ensley is heard telling Crews that she had received a call from Crowder which she returned. But before the government could ask about the recording, the district judge interrupted the cross examination and held a sidebar. Once it became clear that the government believed Ensley had perjured herself by denying pre-arrest acquaintance with Crowder, the court appointed an attorney to represent her.

After consulting with Ensley, the government, and defense counsel, Ensley's attorney acknowledged that there was "a potential problem based upon her earlier testimony" because the "jail call transcript" arguably contradicted her testimony that she had never received a phone call from Crowder. Trial Tr. 107, March 5, 2014. "But more importantly," he added, "it's my impression that this is not the only source of potential impeachment that they may have for Ms. Ensley." *Id.* Ensley's attorney also said the Government took the position that the testimony Ensley gave before the grand jury and at the first trial "may not have been entirely accurate." *Id.* Because of that, the attorney explained, Ensley decided that "she's going to assert her Fifth [Amendment privilege against self-incrimination,] . . . and she will not answer any further questions." *Id.* at 108. Ensley confirmed on the record that she wished to assert her constitutional privilege and acknowledged that by doing so she was giving up her right to testify. Supp. App. 400-01.

The parties then turned to what to do about Ensley's direct testimony. Crews's counsel urged the district judge not to require Ensley to assert her Fifth Amendment privilege in the presence of the jury. The government, for its part, encouraged the district judge to strike all of Ensley's testimony—the direct testimony as well as the cross examination. Crews's counsel

did not state an objection to the government's request, but raised a concern that the jurors might infer that they should also ignore the surveillance video taken outside the Maryland 7-Eleven, which placed Crews in the suburbs doing errands with Ensley on the morning of the robbery.

The district judge allowed the 7-Eleven security video to remain in the record because the parties had stipulated to its authenticity, and did not require Ensley to assert her privilege before the jury. With those issues resolved, the district judge instructed the jury to disregard the entirety of Ensley's testimony. After deliberating, the jury found Crews guilty of attempted robbery.

## II.

On appeal, Crews argues that the district court erred in handling Brennan's and Ensley's testimony. He contends that the district court should have granted his motion for a mistrial after Brennan's testimony, or at least should have considered a remedy more limited than striking all of Ensley's testimony after she asserted her privilege against self-incrimination. We disagree on both points and hold that the district court did not err in its treatment of either witness's testimony.

## A.

Crews claims that the district court abused its discretion by denying his motion for a mistrial after emergency room nurse Joseph Brennan testified that Dean appeared gravely wounded, and in particular that he had "what looked like brain matter that was exposed." Supp. App. 234. Crews argues that the district judge's curative instructions did not mitigate the prejudice to him from Brennan's "brain matter" testimony. We review the district court's denial of Crews's motion for a mistrial for abuse of discretion. *United States v. Gartmon*, 146 F.3d 1015, 1027

(D.C. Cir. 1998). "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (quoting *United States v. Clarke*, 24 F.3d 257, 270 (D.C. Cir. 1994)). A mistrial is warranted if inadmissible evidence is erroneously presented to the jury that is so "highly prejudicial" that the jury cannot reasonably be expected to ignore it. *United States v. Eccleston*, 961 F.2d 955, 961-62 (D.C. Cir. 1992). On review, we must therefore determine "the extent to which the defendant was unfairly prejudiced." *McLendon*, 378 F.3d at 1112. To that end, we "consider a number of factors, including the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." *Id.*

All three of these factors weigh against Crews. First, Brennan's testimony, while graphic, had only the slightest prejudicial potential. Crews contends that the testimony may have led the jury to conclude that Crews callously left Dean to die. Alternatively, he suggests that the jury may have believed that Dean became gravely injured during the attempted robbery (rather than after James and Crews left the scene), which would contradict James's testimony that Dean was able to run back to the car. But Brennan's "comment was brief, and, viewed in context, less harmful to [Crews] than [he] maintains." *United States v. Wheeler*, 753 F.3d 200, 207 (D.C. Cir. 2014). Multiple witnesses testified that all three men ran from the CVS. Thus, the only plausible inference is that Dean sustained his fatal injury after he and Crowder separated from Crews and James. By the same token, the jury had no reason to believe that Crews abandoned Dean to die; in fact, the evidence was uniformly to the contrary. James testified that after he, Dean, and Crews ran to the car, Dean turned to go back to re-engage in a firefight with Whitaker. It was only because Crews

physically prevented Dean from doing so and forced him into the getaway car that Dean was taken to the hospital.

Second, the district judge mitigated any prejudice from Brennan's testimony by his curative instructions to the jury. We generally presume that "a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it" absent "an overwhelming probability that the jury will be unable to follow the court's instructions." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987). At the close of Brennan's testimony, the district judge reminded the jurors that Dean died from an unrelated gunshot wound and instructed them to "disregard the testimony [they] heard about brain matter and matted, bloody hair." Trial Tr. 123-24, Feb. 20, 2014. The district judge also warned the jurors not to allow sympathy or passion to affect their judgment. Crews claims those instructions did not cure the prejudice because they were "neither immediate nor emphatic." Appellant Br. 29. But the district court gave the curative instruction at the close of Brennan's testimony. And the quality of the instruction was consistent with curative instructions that this court has previously viewed as sufficiently emphatic. *Compare* Trial Tr. 123-24, Feb. 20, 2014, *with McLendon*, 378 F.3d at 1113 (characterizing the district court's instruction "reminding the jury . . . to disregard" the testimony as "stern[]").

Third, the government provided ample evidence to support the jury's verdict, making it exceedingly unlikely that Brennan's testimony that he saw "brain matter" changed a possible acquittal to a conviction. *See McLendon*, 378 F.3d at 1112. Crews argues otherwise. He likens the prosecution's case against him to the evidence presented in *United States v. Eccleston*, 961 F.2d 955. There, we vacated the conviction of a defendant after the jury heard inadmissible hearsay testimony related to a fact central to the prosecution's case: whether the

defendant currently lived at his mother's house when the police discovered drugs and weapons inside. *Id.* at 960-61. The defendant claimed he had moved out of the house and was living in a nearby apartment. But an investigating officer testified that he stopped three men walking toward the house who told him they were on their way to purchase drugs from the defendant. The district judge instructed the jury to disregard the hearsay testimony, but denied the defendant's motion for a mistrial. We reversed, explaining that "the danger of prejudice" was particularly severe "because of the weakness of the government's case," which relied on "wholly circumstantial" evidence, including ambiguous statements by the defendant's parents and suggestions that the defendant lived at his mother's house in the past. *Id.* The prejudicial hearsay thus could not be cured, necessitating a mistrial.

Here, by contrast, the evidence that Crews engaged in the attempted robbery was direct and strong. Crews claims that the evidence only placed him in the general vicinity of the CVS. But that ignores James's testimony that Crews came with him and Dean to the confrontation with Whitaker at the CVS. Jones, the driver of the Garda armored truck, also identified Crews after police apprehended him a few blocks from the store as one of the three men who participated in the robbery attempt. And the police discovered Crews's DNA on the inside of a piece of a latex glove found in Ensley's car. Noting that the first trial ended in a mistrial, Crews suggests that Brennan's graphic testimony at the second trial tipped the jury against him, but "the fact that [the] case previously ended in a mistrial is not sufficient to establish that the case was close." *McLendon*, 378 F.3d at 1115. Given the weight of the evidence against him, there is no reasonable chance that Brennan's testimony had a material effect on the jury.

**B.**

We are also unpersuaded by Crews's argument that the district court violated his constitutional right to call witnesses in his defense when it struck the entire testimony of his sole witness, Vakeema Ensley, in response to her invocation of her privilege against self-incrimination. Ensley initially invoked the privilege in response to a cross-examination question about whether she knew Antwon Crowder before the arrests but, following colloquy among counsel and the court, Ensley received appointed counsel and asserted a blanket privilege against any further testimony. The district court, at the government's request, responded by striking all of Ensley's direct testimony. Crews's trial counsel requested that Ensley not have to invoke the privilege on the stand and that the 7-Eleven security video remain in evidence, but did not object to the striking of Ensley's direct testimony.

Having failed to argue in the district court that Ensley's direct testimony could be retained consistently with her invocation of the Fifth Amendment, Crews now faults the district court for failing to inquire *sua sponte* into the scope of Ensley's privilege. Under our precedent, blanket assertions of the privilege against self-incrimination are disfavored. *See United States v. Thornton*, 733 F.2d 121, 125-26 (D.C. Cir. 1984). We have made clear, however, that "the district court's failure to inquire *sua sponte* whether the witness was entitled to assert a blanket privilege" does not result in plain error if the district court had some basis in the record supporting the witness's broad assertion. *United States v. Ortiz*, 82 F.3d 1066, 1073 (D.C. Cir. 1996).

Despite the absence of a contemporaneous objection, Crews urges us to review the decision for abuse of discretion rather than plain error, relying primarily on *United States v.*

13

*Wilson*, 605 F.3d 985 (D.C. Cir. 2010). In *Wilson*, we reviewed the district court's evidentiary ruling for abuse of discretion when it was "apparent from the context" of the district court's reasoning that the defendant had raised a Confrontation Clause claim. *Id*. at 1011-12. But it is not "apparent from the context" here that Crews raised a constitutional objection to the district court's decision to allow Ensley's broad invocation of her constitutional privilege and then remedy any prejudice to the government by striking her testimony. We therefore review for plain error. *See Ortiz*, 82 F.3d at 1072-73. To prevail, Crews must show "(1) that there was an error, (2) that the error was clear or obvious, (3) that it affected [his] substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gooch*, 665 F.3d 1318, 1332 (D.C. Cir. 2012) (citing *United States v. Olano*, 507 U.S. 725, 732-37 (1993)).

Here, the first two prongs of the plain error test—whether there was an error that was clear or obvious—are dispositive. The parties agree that we should assess the district court's decision to strike Ensley's testimony under the standard the Second Circuit used in *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963). In that case, a government witness testified on direct examination but avoided being impeached during cross examination because he invoked his privilege against self-incrimination. *Id.* at 611-13. The defendants' attorneys unsuccessfully urged the district court to allow them to proceed with cross examination or, in the alternative, that the court should strike the direct testimony. *Id.* at 611-12. In holding that the district court's handling of the privilege was reversible error, the Second Circuit developed an analytic rubric that other courts have found useful.

To illustrate how the measures a court must take to avoid prejudice vary by context, the *Cardillo* court distinguished

three situations in which a witness might refuse to respond to questions, and the corresponding cures: *First*, refusal to respond where "the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken"; *second*, refusal to answer questions "connected solely with one phase of the case in which event a partial striking might suffice"; and, *third*, refusal to answer questions involving "collateral matters or cumulative testimony concerning credibility which would not require a direction to strike," but could instead be handled by issuing a curative instruction to the jury. *Id.* at 613. The court explained that a "distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination." *Id.* at 611. Even as it reversed the district court's failure to strike the witness testimony, the court of appeals stressed that not every refusal to answer "requires the striking of [a witness's] testimony or a part thereof." *Id.* at 613. Other circuits have embraced *Cardillo*, *see, e.g.*, *United States v. Gary*, 74 F.3d 304, 310 (1st Cir. 1996); *Denham v. Deeds*, 954 F.2d 1501, 1503 (9th Cir. 1992); *Carlos v. Wyrick*, 753 F.2d 691, 693 (8th Cir. 1985), but we have not yet had occasion to do so.

We note at the outset the potential confusion engendered by Crews's reliance on *Cardillo*, the facts of which do not cleanly map onto those in Crews's case. The defendants in *Cardillo* sought to cross examine a government witness who invoked his privilege against self-incrimination. 316 F.2d at 611-12. Allowing the witness to avoid cross examination without striking any of his direct testimony would have impaired the defendants' Sixth Amendment right to confront witnesses against them. But here, the tables are turned. It is

the government that sought to cross examine a defense witness who invoked her privilege against self-incrimination. The potential prejudice to the government from preventing its cross examination of Ensley, unlike the prejudice to the defendants in *Cardillo*, has no constitutional dimension. Whereas in *Cardillo* the defendants' confrontation rights *required* that witness testimony be stricken, Crews argues the inverse: that his constitutional right to present witnesses in his favor *forbade* the court from striking Ensley's testimony. *Cardillo*'s underlying analysis sheds light on Crews's claim, but it does not pick up on Crews's important point about his constitutional right to present witness testimony in his defense. *See Denham*, 954 F.2d at 1503 ("*Cardillo* and cases like it do not address the tension inherent, when the witness is defendant's, between the prosecution's need to cross-examine and the defendant's right to call witnesses on her own behalf.").

Even assuming, as both parties do, that the *Cardillo* framework applies, it does not support Crews's claim of error. Crews would have us treat his claim under the third category, viewing Ensley's assertion of privilege as preventing cross examination only into the "collateral" matter of her "credibility." 316 F.2d at 613. The court thus erred, says Crews, by striking Ensley's entire testimony rather than retaining it with curative jury instructions. Appellant Br. 19.

*Cardillo*'s analysis of credibility issues is more nuanced than Crews suggests. It does not treat all questions concerning credibility as "collateral," nor does it suggest that the related testimony of a witness who refuses to answer questions going only to credibility need never be stricken. That would make no sense; witness credibility is sometimes the linchpin of an entire defense. *See Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 935 (D.C. Cir. 1991). Rather, *Cardillo*'s third category refers to privilege invocations that defeat a defendant's ability

to elicit "*cumulative* testimony concerning credibility," where the type of testimony concerns the "*general* unsavory character of the witness." *Cardillo*, 316 F.2d at 613 (emphasis added). Indeed, the *Cardillo* court itself found reversible error in the trial court's failure to strike related testimony where the privilege claim prevented the defendant from challenging the witness's credibility through cross examination that "might have established untruthfulness with respect to specific events of the crime charged." *Id.*

Ensley's invocation of her privilege against self-incrimination fell within *Cardillo*'s first category, not its third. The government attempted not merely to question Ensley's general credibility by, for example, asking about her own involvement in crime or her reputation for truthfulness, s*ee id.* at 612-13, but sought to question her regarding "specific events of the crime charged," *id.* at 613, namely, the likelihood that Ensley willingly gave her car keys to the alleged co-conspirators. If the jury were to credit Ensley's testimony that she did not know Dean and Crowder, it would be less likely to believe James's testimony that Ensley loaned them her car. The government's questions about her knowledge of Crowder thus related to an event the government sought to prove.

Crews contends that the jury should have been able to rely on the bulk of Ensley's direct testimony, as it had at the first trial. But he fails to acknowledge that Ensley did not limit her invocation of the privilege. Ensley's court-appointed counsel not only noted that "there is a jail call transcript which arguably" contradicted her testimony about Crowder, but he also told the district judge that his conversations with the prosecution left him with the impression that the government had other sources of "potential impeachment" evidence. Supp. App. 392. In view of the government's position that Ensley had also perjured herself before the grand jury and during her

testimony in the previous trial, however, Ensley's counsel stated that "she will not answer *any* further questions." Supp. App. 393 (emphasis added). Ensley likewise acknowledged without qualification that she wished to give up her right to testify.

Finally, in support of his claim that striking Ensley's testimony in its entirety was error, Crews offers alternatives less damaging to his defense that he contends the district court could have explored, including reading to the jury the transcript of Ensley's testimony from the first trial. *See* Appellant Br. 21-24. Crews does not argue that the Constitution required the district court to employ the alternatives he suggests, but raises them to demonstrate that the "district court had multiple ways in which it could have reconciled the government's right to cross examine Ensley with Crews'[s] constitutional rights to call witnesses and present a defense." Appellant Reply Br. 13-14. We are willing to assume that the district court had viable alternatives, but Crews did not suggest any at trial. The court did not plainly err by failing to consider them *sua sponte*. *See Ortiz*, 82 F.3d at 1072-73; *see also United States v. Hargrove*, No. 99-3298, 2000 WL 1227895, at *2 n.1 (10th Cir. Aug. 30, 2000) ("That the district court did not give a limiting instruction or consider 'evidentiary alternatives'" did not establish reversible error if the defendant "neither requested an instruction nor presented 'alternatives' during the course of trial.").

We acknowledge that the district court could have done more to test the precise basis and scope of Ensley's invocation of her privilege, but the court's failure to inquire further is unsurprising where none of the parties asked it to do so at the time. On plain error review, we cannot say it was "clear or obvious," *Gooch*, 665 F.3d at 1332, that Ensley had asserted her Fifth Amendment privilege against self-incrimination only

with respect to certain, limited questions. Thus, the district court did not plainly err by excluding all of her direct testimony.

*   *   *

Because the district court did not commit reversible error by denying Crews's motion for a mistrial or striking Ensley's testimony, we affirm the judgment of conviction.

*So ordered.*