# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 12, 2008           Decided July 22, 2008

No. 06-3172

UNITED STATES OF AMERICA,
APPELLEE

v.

MELVIN ERIC GEORGE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00043-01)

———


*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. with her on the briefs was *A. J. Kramer*, Federal Public Defender. *Tony W. Miles*, Assistant Federal Public Defender, entered an appearance.

*Chrisellen R. Kolb*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A.*

2

*Taylor*, U.S. Attorney, and *Roy W. McLeese III*, *Florence Y. Pan*, and *Frederick W. Yette*, Assistant U.S. Attorneys.

Before: GINSBURG, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: A jury convicted Melvin George of robbing a Citibank branch of $2,095, in violation of 18 U.S.C. § 2113(a). For this crime he received a sentence of ninety-two months in prison followed by three years of supervised release. Mr. George's sister, Janene George, gave crucial testimony against him. At trial, Mr. George wanted to cross-examine his sister about her mental illness. Doing so, he believes, would have shown she was neither competent nor credible. The district court, finding no basis for this assumption, refused to let defense counsel cross-examine Ms. George about her mental health; on that basis Mr. George appeals his conviction.[1] We affirm.

I

Mr. George moved into his sister's Washington, D.C. apartment on December 7, 2005. She gave him some clothing to wear, including a black coat and a green, beige, and orange kufi hat. Just one day later, Mr. George left the apartment in the late morning, wearing the kufi hat, and returned a few hours later with a bag full of cash. He counted the money at

---

[1] Originally, Mr. George also challenged the district court's practice of accepting questions from jury members to pose to witnesses. He concedes the same issue arose in *United States v. Rawlings*, 522 F.3d 403, 407–08 (D.C. Cir. 2008). Reply Br. 3. Therefore, our decision in *Rawlings* that such a practice is not *per se* improper, 522 F.3d at 407–08, disposes of this challenge.

his sister's kitchen counter, and when she asked Mr. George where he got it, he said, "I robbed the bank," and told her where the bank was. Ms. George estimated she saw $2,200 to $2,400 laid out on her counter.

Indeed, at just that time somebody had robbed a Columbia Road bank of $2,095. A security camera captured the transaction: a six-foot tall man wearing a patterned kufi, a black coat, and wire-rimmed glasses showed the teller a demand note, received the cash she gave him, and left carrying the cash in a distinctive bag. A detective inspected the video and prepared a description of the suspect, which the police circulated by the end of the day.

Mr. George's sister eventually identified him from the description, but reporting his crime took a surprising amount of perseverance. The response of police officials ranged from derogatory to dismissive. At Ms. George's first attempt, the day after the robbery, the detective at the police station who listened to her story told her to "[g]et . . . out" because she was "a snitch." On her second attempt, she reported the robbery to her apartment complex's rental office; the police were called. The responding officer, encountering Mr. George in the hallway after Ms. George had identified him as the suspect, asked Mr. George what was wrong with his sister and was she "lunching." The officer left her $1.15 for bus fare to come downtown and make a report. Finally, on December 14, 2005, Ms. George met the detective who was investigating the Citibank robbery; he showed her the "wanted" posters for the first time. Two weeks later she returned bearing what she said were Mr. George's kufi and the cash bag, as well as other physical evidence.

At trial, Mr. George's sister was the government's star witness. Because the surveillance video was too fuzzy for a

positive identification, her testimony that Mr. George was the person seen on the videotape was critical. Similarly, she connected Mr. George to the kufi she gave the police. Although an FBI forensic analyst found it impossible to tell whether this was the kufi seen in the video, Ms. George asserted it was the same hat. Moreover, she testified Mr. George claimed to have robbed a bank, and she saw him with cash roughly equivalent to the amount obtained in the robbery.

Understanding the importance of Ms. George's testimony, defense counsel made considerable efforts to impeach her credibility. Counsel cross-examined Ms. George about a pending assault charge on which she was negotiating a plea deal with police and brought out that she had once assaulted and temporarily imprisoned her lover. The defense also emphasized Ms. George's twenty-year history of PCP use—an addiction she admitted had continued throughout December 2005. Finally, the defense wanted to cross-examine Ms. George about her mental health history. She had been hospitalized at the Psychiatric Institute of Washington in April 2005 and had been diagnosed with bipolar disorder. The disorder had persisted since 1990 and symptoms included "episodes of rage, anger, irritability, and racing thoughts," leading to "behavior that is life threatening, destructive, or disabling to self or others." However, the doctor observed "no clear psychotic symptoms." The district court refused to allow this line of cross-examination, concluding that the sister's records did not provide a basis "upon which to cast doubt on her ability or her willingness to tell the truth" and that even if they did, an expert would be needed to interpret the significance of bipolar disorder for the jury. Tr. 233–34.

5

II

The right to cross-examine prosecution witnesses is a fundamental guarantee of the Confrontation Clause of the Sixth Amendment. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). Accordingly, a violation of this right is reversible error unless the government shows it was harmless beyond a reasonable doubt. *Id*. at 680–81. Whether the right was violated must be gauged with respect to "the particular witness, not . . . the outcome of the entire trial." *Id*. at 680. The central question is whether the jury would have received "a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *United States v. Davis*, 127 F.3d 68, 70–71 (D.C. Cir. 1997). Thus, there is rarely a Confrontation Clause violation if "defense counsel is able to elicit enough information to allow a discriminating appraisal" of the witness's credibility. *United States v. Derr*, 990 F.2d 1330, 1334 (D.C. Cir. 1993).

Below that threshold, "a trial court retains broad discretion to control cross-examination." *United States v. Hemphill*, 514 F.3d 1350, 1360 (D.C. Cir. 2008). The court "may prevent questioning that does not meet the basic requirement of relevancy." *Id*. In particular, defense counsel "must have a reasonable basis for asking questions which tend to incriminate or degrade the witness." *Id*.

Denying cross-examination about Ms. George's mental health did not violate Mr. George's right to confront her, in part because she had already been impeached by much more damning evidence. Ms. George freely admitted she hoped to receive a reward for implicating her brother in the robbery. Defense counsel elicited information about the plea bargaining in which she was simultaneously engaged, a

substantial source of bias. In addition, counsel cross-examined Ms. George about the violent behavior that had led to her arrests. She had manifested violence towards her cousin and towards her lover, and a jury could reasonably infer she was less than kind to those close to her. These lines of cross-examination already suggested Ms. George had powerful motives to lie about her brother and no overwhelming inclination to resist.

Mr. George now says the real point was that his sister's mental illness decreased her competence, as opposed to her desire, to tell the truth. We are unable to find this argument in the trial record, but regardless, defense counsel severely undermined Ms. George's competence as well. Counsel established by cross-examination that Ms. George had used PCP for twenty years, that she had used PCP during December 2005, and that she had tested positive for PCP around the time she testified to the grand jury. Tr. 297–99. PCP is a dissociative drug that can cause delusions and hallucinations and, with long-term use, memory loss. James C. Munch, *Phencyclidine: Pharmacology and Toxicology*, U.N. Office of Drug Control Bull. on Narcotics, 1974 No. 4, at 9. Thus, it is often relevant "to develop the matter of drug addiction in an effort to attack a witness's competency and capacity to observe, remember and recall." *United States v. Kearney*, 420 F.2d 170, 173 (D.C. Cir. 1969). Defense counsel had the opportunity to apply Ms. George's PCP use in this way.

Against this background we must test whether the additional cross-examination Mr. George wanted would have provided "a significantly different impression" of his sister's credibility. Mental health records may, but do not necessarily, "cast doubt on the accuracy of a witness'[s] testimony." *United States v. Smith*, 77 F.3d 511, 516 (D.C.

7

Cir. 1996); *see also United States v. Slade*, 627 F.2d 293, 304 (D.C. Cir. 1980) (mental history has the potential to be relevant impeachment evidence).  Mental illness "is relevant only when it may reasonably cast doubt on the ability or willingness of a witness to tell the truth."  *Smith*, 77 F.3d at 516.  A defendant proposing a line of cross-examination has the responsibility to make some proffer suggesting its relevance.  *Davis*, 127 F.3d at 71 ("[We cannot conclude that . . . a reasonable jury might have received a significantly different impression . . . since defense counsel made no proffer . . . .").

The days are long past when any mental illness was presumed to undermine a witness's competence to testify. The category of mental illnesses includes a wide variety of conditions, of varying degrees of severity and substantially different effects.  Simply labeling a witness as having "mental health problems," Def.'s 2d Mot. in Limine 3, or alluding to her "issues with rage, anger, [and] racing thoughts," Tr. 233, does not provide a basis for thinking she cannot correctly perceive reality.  Mental illness is most highly relevant when "the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness . . . that dramatically impaired her ability to perceive and tell the truth."  *United States v. Butt*, 955 F.2d 77, 82–83 (1st Cir. 1992).  We have recognized mental illness as potentially relevant in a broader range of circumstances, so that, for example, depression could in some cases be relevant to credibility.  *Smith*, 77 F.3d at 516.  Nevertheless, some indication is needed that a particular witness's medical history throws some doubt on the witness's competence or credibility.  *Id.* at 516–17 (on the basis of hospitalization alone, "without viewing the medical records," no way to decide whether the witness's mental health was relevant); *compare United States v. Pryce*, 938 F.2d 1343, 1346 (D.C.

Cir. 1991) (cross-examination allowed when a witness had a history of hallucinations) *and United States v. Lindstrom*, 698 F.2d 1154, 1164 (11th Cir. 1983) (cross-examination allowed when the witness's treating psychiatrist wrote "[s]he chronically misinterprets the words and actions of others" (emphasis omitted)) *with Butt*, 955 F.2d at 82–84 (cross-examination excluded on mental health of a witness who was simply "an angry and alert individual" with "atypical depression," "rejection sensitivity," "impulsivity and despair") *and United States v. Jimenez*, 256 F.3d 330, 343–44 (5th Cir. 2001) ("[A] diagnosis of schizophrenia or a psychosis will be relevant . . . [F]or witnesses whose mental history is less severe, district courts are permitted greater latitude.").

Nothing in Mr. George's proffer at trial indicated why bipolar disorder would cause Ms. George difficulty in perceiving reality or motivate her to hurt her brother.[2] The bouts of anger and self-destructiveness she experienced are just the sort of mental problem about which courts have often prohibited cross-examination. *See, e.g.*, *Jimenez*, 256 F.3d at 344 (no cross-examination about a witness's suicidal tendencies, especially considering the cross-examination about his drug use and criminal activity). We do not foreclose the possibility that testimony by an expert, which the trial judge suggested, could have shown evidence of Ms. George's condition to be relevant to her credibility and sufficiently distinct from evidence of drug use and violence that the Confrontation Clause might require its admission.

---

[2] The defendant points to an evaluation of Ms. George by the District of Columbia Department of Mental Health three months after trial to show what cross-examination would have revealed. This record was not available at trial and therefore could not have supplied a reasonable basis for thinking cross-examination about Ms. George's mental health would have been relevant.

But without such testimony, Mr. George's counsel had only words such as "episodes of rage" and "racing thoughts." Mental illness is not a generic badge of incompetence or dishonesty.[3]

Nor did the district court abuse its discretion in excluding this cross-examination. The court diligently applied the standard we developed in *Smith*, asking whether Ms. George's mental illness would reasonably cast doubt on her ability or willingness to tell the truth. Having concluded it would not, it suggested the possibility of an expert to explain why her bipolar disorder would be relevant. In the absence of any further proffer by defense counsel, it was reasonable for the district court to exclude cross-examination on the issue.

### III

For the reasons given above, the judgment of the district court is

*Affirmed.*

---

[3] Because our conclusion that Mr. George's right to cross-examine Ms. George was not violated depends both on the limited relevance of the mental health evidence he offered and on the nature of the background impeachment evidence he introduced at trial, we do not address whether a trial judge could, consistent with the Confrontation Clause, exclude more relevant evidence solely on the ground that other impeachment evidence had already been used at trial.