# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 17, 2008          Decided March 6, 2009

No. 05-3201

UNITED STATES OF AMERICA,
APPELLEE

v.

JAMES T. FOSTER,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00395-02)

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender, was on brief. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Christopher R. Kavanaugh*, Assistant United States Attorney, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, and *Roy W. McLeese III*, *Elizabeth Trosman*, and *Patricia Stewart*, Assistant United States Attorneys, were on brief.

Before: GINSBURG and HENDERSON, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: James Foster was convicted of one count of unlawful distribution of cocaine and one count of possessing with intent to distribute (PWID) 50 grams or more of cocaine base. The district court sentenced Foster to 12 years' incarceration on each count to run concurrently. Foster appeals the judgment, arguing that the district court erred in denying his motion for a mistrial on the distribution count based on a government witness's surprise testimony at trial. He also challenges the sufficiency of the evidence to support his conviction on the PWID count. For the following reasons, we affirm the judgment of conviction.

## I.

On August 21, 2002, the appellant, James Foster, and Debra Waldrop, his wife at the time,[1] were arrested. On September 19, 2002, a federal grand jury returned an indictment charging Foster and Waldrop with two counts of distribution of cocaine base, once on June 27, 2002, and the second time on August 12, 2002, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[2] The indictment also charged Foster and Waldrop with one count of PWID 50 grams or more of cocaine base on August 21, 2002,

---

[1] At trial Foster's mother testified that Foster and Waldrop were married and living together during the first part of 2002. Foster's mother testified that Foster came to live with her in approximately June 2002.

[2] 21 U.S.C. § 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(b)(1)(C) provides that "[i]n the case of a [schedule I or II controlled substance], . . . [a] person [violating § 841(a)] shall be sentenced to a term of imprisonment of not more than 20 years."

in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii).[3] Both were also charged with aiding and abetting on each count under 18 U.S.C. § 2. Waldrop was charged with an additional count of distributing cocaine base on August 15, 2002. She pleaded guilty to all four counts and was sentenced to 70 months' imprisonment on three counts and 120 months' imprisonment on one count to run concurrently. Foster pleaded not guilty to all counts.

Foster's jury trial commenced on November 10, 2003. The government's primary witness was Detective Lavinia Quigley, an undercover narcotics officer with the District of Columbia (District) Metropolitan Police Department (MPD). Sometime before June 27, 2002, Quigley received information from a "special employee" that drugs were being sold at an apartment in the District. On June 27, 2002, Quigley went to the apartment and knocked on the window. A black male opened the door and Quigley entered. Waldrop was sitting on a couch in the apartment. Quigley asked for $60 worth of cocaine base. The male removed a plastic bag containing cocaine base from a bottle and placed the bag on the table. Waldrop opened a black pouch, took out a plastic bag containing cocaine base and broke off a piece. The male gave Quigley a lottery ticket in which to wrap the piece of cocaine base. Quigley gave Waldrop $60 and left the apartment. Quigley was in the apartment approximately five minutes. She sat a few feet from the man and Waldrop and testified that the lighting was like that in the courtroom. In court, Quigley identified Foster as the male at the apartment on June 27, 2002.

---

[3]21 U.S.C. § 841(b)(1)(A)(iii) provides that in the case of a violation of § 841(a) involving "50 grams or more of a mixture or substance . . . which contains cocaine base," the person "shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life."

Quigley returned to the apartment on August 12, 2002 and purchased more cocaine base from Waldrop. Quigley observed Foster sleeping on a bed in the living room during the transaction. At the close of the government's case, the court granted Foster's motion for judgment of acquittal as to the second count (the August 12th transaction) based on insufficient evidence tying Foster to the sale. Quigley also purchased cocaine base from Waldrop on August 15, 2002, but Foster was not in the apartment at the time and was not charged. Following the August 15th transaction, Quigley obtained a search warrant.

Quigley returned to the apartment the final time on August 21, 2002. Foster opened the door and let Quigley in. Foster sat next to Waldrop on one couch and Quigley sat on another couch. Quigley told Waldrop she wanted to purchase three "eight balls" of cocaine base. Trial Tr. at 43, *United States v. Foster*, Cr. No. 02-395 (D.D.C. Nov. 12, 2003) (Tr. 11/12/03am). Waldrop went into a back room in the apartment and came back with a blue pouch containing several plastic bags. Before Quigley could complete the transaction, a black female knocked at the front door. Foster answered the door and the woman told him she wanted to make a buy. Quigley testified that "Mr. Waldrop [sic] went next to Ms. Foster [sic], picked up a ziploc off the table and handed it to the black female." *Id.* at 44. On cross-examination, Quigley testified that "Ms. Waldrop had already given [the woman] the zip" before Waldrop and the woman discussed the payment. *Id.* at 84. Quigley then testified that "Mr. Foster gave the black female the ziploc containing crack cocaine." *Id.* Quigley clarified that "Mr. Foster handed [the black female] the drugs and [Waldrop] took the money." *Id.* at 86. On redirect, the prosecutor asked Quigley "who actually handed the female who came into the apartment the small packet of drugs she asked for?" *Id.* at 92. Quigley replied, "Ms. Waldrop, I mean Mr. Foster." *Id.* The woman and Waldrop were discussing the price when MPD officers knocked on the door and entered the apartment to execute the search warrant.

Waldrop ran to the bathroom with the blue pouch to flush the drugs but Quigley convinced her to place the blue pouch in the toilet tank.

The MPD officers arrested Foster and Waldrop. They seized a blue pouch containing 50 grams of cocaine base from the toilet tank; four ziploc bags containing 0.82 grams of cocaine base from a tray in the living room; ten ziploc bags containing 2 grams of cocaine base from a container on the television; a plate on a shelf underneath the television containing 0.50 grams of cocaine base residue, a razor blade and empty ziplocs; and a bag containing 0.19 grams of cocaine base in plain view on an end table. The officers also found a District Department of Human Services identification card belonging to Foster, a marriage license attesting to the marriage of Waldrop and Foster in a dresser drawer in the bedroom and male clothing in the bedroom.

During cross-examination, defense counsel questioned Quigley regarding the black male present at the June 27, 2002 transaction.

**Q:** Okay, now this black male was somebody you didn't know from the past or well let me just say this black male was somebody that you didn't know correct?

**A:** I knew him from the previous buy, from a previous buy, yes.

**Q:** June 27th was your first buy in this investigation, is that correct?

**A:** Okay, it wasn't – I met Mr. Foster.

**Q:** Can we –

**A:** Can I say –

>**Mr. Sussman [defense counsel]:** Can we stop for a second and approach?
>
>**The Court:** Yes, just one moment.
>
>(Bench conference.)
>
>**Mr. Sussman:** I have no idea where she'd [sic] going, but it sounds like there was a previous relationship which was never disclosed.
>
>**The Court:** I think there's a question of dates actually.
>
>**Ms. Lerner [prosecutor]:** Well, I think it's partly she was introduced to a special employee.
>
>**Mr. Sussman:** Did she actually meet them?
>
>**Ms. Lerner:** I believe so. I found that out this afternoon, I mean this morning. I can't speak with Mr. Foster I didn't ask for details because I didn't think that I would go into that. I'm sorry Your Honor, I didn't think that was relevant and I was not going to go into that. I wasn't planning on it.

Tr. 11/12/03am at 56-57. Defense counsel then continued the cross-examination without questioning Quigley further regarding the previous drug transaction and the prosecutor did not raise the matter on redirect. Following the lunch break, defense counsel requested a mistrial because of Quigley's surprise testimony. He claimed Quigley's testimony weakened Foster's mistaken identification defense. The government stated that it had no intention of using Quigley's testimony regarding the prior drug transaction. The court denied Foster's motion for a mistrial and gave the following curative instruction as specifically requested by the defense:

>We kept you [the jury] waiting a little bit because we were having a discussion about what we thought was

> some confusion in the testimony of Detective Quigley, and so I just after our discussion wanted to give you an instruction from the Court, and that is that the first event in this investigation and the first event on which you are to concern yourself occurred on June 27 of 2002. And if it appeared that there was any testimony about anything prior to that date, it's totally irrelevant and should be disregarded by the jury.

Trial Tr. at 13-14, *United States v. Foster*, Cr. No. 02-395 (D.D.C. Nov. 12, 2003) (Tr. 11/12/03pm). Foster presented two alibi witnesses who testified that he was with them at the time of the alleged drug transaction on June 27, 2002. Before jury deliberations, Foster moved for a judgment of acquittal on the two remaining counts (June 27 and August 21), which motion the court denied.

The jury returned a guilty verdict against Foster on count one, distribution of cocaine base on June 27, 2002, and count four, PWID 50 grams or more of cocaine base on August 21, 2002. Foster moved for a new trial on count one based on Quigley's surprise testimony, which motion the district court denied. Foster was sentenced to 144 months' imprisonment on each count (concurrent). Foster timely appealed.

## II.

We review the district court's evidentiary rulings and denial of the mistrial motion for abuse of discretion. *United States v. Watson*, 409 F.3d 458, 462 (D.C. Cir. 2005) (evidentiary rulings); *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004) (denial of mistrial). We review the sufficiency of the evidence to determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002)). "In making this determination, 'the

prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *Id.* (quoting *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986)).

## A.

Foster first contends that the district court erred in not declaring a mistrial after Quigley unexpectedly testified that she had met Foster during a drug buy before June 27, 2002. "'A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor.'" *McLendon*, 378 F.3d at 1112 (quoting *United States v. Clarke*, 24 F.3d 257, 270 (D.C. Cir. 1994)). The "most important consideration in ruling on a motion for a mistrial is the extent to which the defendant was unfairly prejudiced." *Id.* In determining whether the defendant was "unfairly prejudiced," we consider "the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." *Id.* (citing *United States v. Eccleston*, 961 F.2d 955, 959-60 (D.C. Cir. 1992)). Stated differently, "'we must determine with fair assurance that the judgment was not substantially swayed by the error.'" *United States v. Spinner*, 152 F.3d 950, 961 (D.C. Cir. 1998) (quoting *Clarke*, 24 F.3d at 267).

Foster asserts that he was unfairly prejudiced by Quigley's testimony because the testimony weakened his mistaken identification defense on the first count and he had no opportunity to rebut the testimony because it was unexpected. Evidence that Quigley had met Foster previously made it less likely that she mistakenly identified him as the man at the apartment on June 27, 2002. Foster also claims that he was unfairly prejudiced because Quigley's testimony suggested an

improper ground for conviction. While Quigley testified only that she "knew [Foster] from the previous buy" and not that he had participated in the buy, Tr. 11/12/03am at 56, the testimony created a risk that the jury would convict Foster of a crime other than that charged, "'or that, uncertain of guilt, it w[ould] convict anyway because a bad person deserves punishment.'" *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)). The government argues that Foster suffered little, if any, prejudice because Quigley's testimony was "tentative, confusing, and stopped immediately." Appellee's Br. 16. The prosecutor did not question Quigley about the testimony on rebuttal or refer to Quigley's testimony in closing argument. *Cf. Spinner*, 152 F.3d at 960-62 (admission of prior bad acts evidence without notice not harmless in part because prosecutor referred to evidence in closing argument). Because the government does not contest that any prejudice resulting from the testimony would be unfair prejudice, Appellee's Br. 16-23, we assume without deciding that any prejudice was unfair.[4]

---

[4]Foster characterizes Quigley's testimony as Rule 404(b) evidence and the government does not argue otherwise. *See* Fed. R. Evid. 404(b) (prior bad acts evidence "not admissible to prove the character of a person in order to show action in conformity therewith" but may be admissible for other purposes "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial"). Some courts question whether Rule 404(b) excludes—or requires advance notice of—testimony elicited by defense counsel on cross-examination regarding prior bad acts evidence the government did not use on direct. *See United States v. Jones*, 145 F.3d 959, 964 (8th Cir. 1998) (Rule 404(b) does not bar admission of prior bad acts evidence elicited by defense counsel on cross-examination (citing *United States v. Kragness*, 830 F.2d 842, 866 n.23 (8th Cir. 1987)). Because the government does not raise the issue, we do not reach it.

Any unfair prejudice resulting from Quigley's testimony, however, was effectively countered by the court's curative instruction. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987), *cited in McLendon*, 378 F.3d at 1114 n.6. In *McLendon*, the defendant was charged with distributing cocaine base. 378 F.3d at 1110. The government presented testimony regarding ammunition found in the defendant's home. *Id.* at 1111. The district court instructed the jury to "disregard" the evidence regarding the ammunition. *Id.* The court later clarified to the jury that the defendant was not charged with possession of any ammunition and instructed it again to "disregard the question and disregard the answer." *Id.* at 1112. On appeal, we found that "[g]iven the brevity of the offending testimony and the clarity of the district court's instructions, we have no reason to doubt the validity of that presumption in this case." *Id.* at 1114. Similarly, Quigley's testimony was brief and the district court clearly instructed the jury to disregard any evidence about any events before June 27, 2002. The court gave the curative instruction promptly and did not repeat Quigley's testimony, factors weighing in favor of our conclusion that the instruction was effective. *Cf. United States v. Slade*, 627 F.2d 293, 308 (D.C. Cir. 1980) (curative instruction ineffective because given day after inadmissible evidence presented and district court repeated inadmissible evidence during instruction).

The weight of the admissible evidence supporting the verdict also supports the district court's denial of the mistrial motion on count one. Quigley testified that on June 27, 2002, she was in the apartment with Foster and Waldrop for a "little under five minutes," that she sat only a few feet from Foster and that the lighting was like that in the courtroom. Tr. 11/12/03am

at 34.  Quigley noted in her buy report the man's approximate height, age and weight and that he had brown eyes and a dark complexion.  *Id.* at 65-66.  Her failure to detail in her buy report more specific characteristics of the man does not mean she did not remember him sufficiently to identify him in court.  Quigley also testified that she saw Foster again on August 12 and August 21, 2002, supporting her identification of Foster as the man present on June 27, 2002.  *See United States v. Gaines*, 436 F.2d 150, 153 (D.C. Cir. 1970) (rejecting mistaken identification defense because "undercover officer made a positive, in-court identification of the appellant and further buttressed the identification with his testimony that he had seen the appellant a number of times both before and after the alleged sale").

During deliberations, the jury asked to see Quigley's buy report for the June 27, 2002 transaction and was told that the report was not in evidence.  The jury also sent three notes to the judge indicating that it was "at a stalemate on the first count," the third note indicating that the jury was "irrevocably deadlocked."  Trial Tr. at 8-9, *United States v. Foster*, Cr. No. 02-395 (D.D.C. Nov. 18, 2003).  After receiving a *Thomas* deadlock instruction, the jury convicted Foster on both counts. *See United States v. Lloyd*, 515 F.3d 1297, 1301 (D.C. Cir. 2008) (citing *United States v. Thomas*, 449 F.2d 1177 (D.C. Cir. 1971) (en banc)).  Foster argues that the jury's request and notes indicate that the evidence that Foster was the man present at the June 27th transaction was weak.  Nevertheless, the other evidence supporting the guilty verdict on count one is sufficient to uphold it.  *Cf. McLendon*, 378 F.3d at 1115 (denying mistrial motion "[i]n light of th[e] strong evidence of [defendant's] guilt, coupled with the judge's curative instructions").

In sum, Foster was not unfairly prejudiced by Quigley's challenged testimony because the strength of the testimony was weak due to its fleeting and ambiguous nature, any prejudice was mitigated by the curative instruction and other evidence

supported the verdict. Accordingly, we conclude that the district court did not abuse its discretion in denying Foster's motion for a mistrial on count one.

**B.**

Foster challenges the sufficiency of the evidence to support his conviction on count four—PWID 50 grams or more of cocaine base on August 21, 2002. To convict Foster on this count, the government was required to show Foster "knowingly or intentionally . . . possess[ed] with intent to . . . distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Possession may be actual or constructive. *United States v. Evans*, 888 F.2d 891, 895 (D.C. Cir. 1989) (citing *United States v. Raper*, 676 F.2d 841, 847 (D.C. Cir. 1982)). "Constructive possession requires that the defendant knew of, and was in a position to exercise dominion and control over, the contraband, 'either personally or through others.'" *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir. 1991) (emphasis omitted) (quoting *Raper*, 676 F.2d at 847). Control may be shown by "'some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them.'" *Id.* (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)). "Mere proximity to the drugs or association with others possessing drugs will not suffice." *Id.* A jury may infer that a person constructively possesses the items in his dwelling even if he shares the dwelling with others. *Dykes*, 406 F.3d at 721; *see also United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992) ("A jury is entitled to infer that a person exercises constructive possession over items found in his home." (citing *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991))).

Foster argues that there was insufficient evidence to prove that he actually or constructively possessed 50 grams or more of cocaine base. As noted by the government, to find possession, the jury must have found that Foster possessed the 50 grams of

cocaine base in the blue pouch Waldrop placed in the toilet tank. Foster notes that Waldrop had actual possession of the blue pouch. He also claims that Waldrop conducted the drug transactions with Quigley and the other woman on August 21, 2002 without his participation. Foster characterizes Quigley's testimony to the contrary as equivocal. Quigley's testimony that Foster gave cocaine base to the other woman, however, was not equivocal. She merely corrected herself as she testified and the jury reasonably credited her account. *See Jenkins*, 928 F.2d at 1178 ("Credibility determinations may rest on a witness's demeanor and, for that reason, are for the jury, not us."). Foster's conduct "'links [him] to the narcotics and indicates that he had some stake in them.'" *Byfield*, 928 F.2d at 1166 (quoting *Pardo*, 636 F.2d at 549).

In addition to Foster's conduct on August 21, 2002, the fact that drugs and drug paraphernalia were in plain sight supports an inference that he constructively possessed the drugs. *See Dykes*, 406 F.3d at 721 (jury could infer that defendant constructively possessed drugs found in his bedroom); *Jenkins*, 928 F.2d at 1179 (jury could infer defendant constructively possessed drugs found in her home in part because some drugs and drug paraphernalia were in plain sight). Moreover, the evidence supported a finding that Foster lived in the apartment. Foster was married to Waldrop, he was in the apartment on two occasions before August 21, 2002 and his identification card, marriage certificate and articles of male clothing were found in the apartment. Accordingly, we conclude that the district court did not abuse its discretion in denying Foster's motion for a judgment of acquittal on count four.

For the foregoing reasons, we affirm the district court's judgment of conviction.[5]

*So ordered.*

---

[5]We note that Foster was also charged with aiding and abetting on both counts that went to the jury and on which he was ultimately convicted, and the evidence was sufficient to convict Foster of aiding and abetting on both counts. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").