# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 21, 2013       Decided May 23, 2014

No. 12-3094

UNITED STATES OF AMERICA,
APPELLEE

v.

JACQUELINE L. WHEELER,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00151-1)

*Steven N. Herman* argued the cause for appellant. With him on the brief was *Steven M. Salky*.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: HENDERSON, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: A jury found that Dr. Jacqueline Wheeler, the owner of a medical clinic in Washington, D.C., fraudulently collected millions of dollars from Medicaid for procedures that were never performed. The district court imposed a substantial prison sentence and ordered Wheeler to forfeit those funds. On appeal, Wheeler challenges both her conviction and sentence. We reject her arguments and affirm the district court.

I

Wheeler owned and managed the Health Advocacy Center, a clinic that treated Medicaid patients. Between January 2006 and April 2008, Wheeler, who was wholly responsible for all of the Center's medical billing, submitted bills to Medicaid for more than $8 million in treatment allegedly provided. Medicaid paid the Center roughly $3.5 million on those bills, $3.1 million of which was for massage treatments.

Acting on a tip that the Center was cheating Medicaid, the Inspector General of the U.S. Department of Health and Human Services began an investigation in 2008. The FBI and Medicaid's Fraud Control Unit soon joined the effort. Investigators easily concluded that many of the Center's bills to Medicaid were false. For example, several bills claimed that the Center had given more than twenty-four hours of massage therapy to a single patient on a single day. Others reported hundreds of hours of massage therapy for days when only one therapist was on staff. Some sought payment for the treatment of patients hospitalized elsewhere.

An investigator visited the Center in late 2008, but Wheeler turned her away. The investigator threatened to return. That night, Wheeler called Acquinette Robinson, a

Center employee, at 4:00 a.m. and asked for help moving files from the clinic to Wheeler's home. Were the files not moved immediately, Wheeler warned her, all of the Center's employees would soon lose their jobs. Robinson refused, and Wheeler moved the files herself. FBI agents obtained warrants and searched the Center and Wheeler's home on February 18, 2009, seizing documents from both locations.

On May 13, 2011, a grand jury indicted Wheeler on one count of healthcare fraud under 18 U.S.C. § 1347 and numerous counts of making false statements relating to healthcare matters under 18 U.S.C. § 1035. The primary battle during the eight-day trial that followed was waged over whether the billings submitted by Wheeler were intentionally false. The government sought to show that they were, asserting that Wheeler used her ill-gotten gains to finance a lavish lifestyle, and highlighting her middle-of-the-night plea for help moving files in the wake of the rebuffed investigator's threatened return. Wheeler, on the other hand, claimed that she had inadvertently inflated the Center's bills for massage therapy fifteen-fold by misunderstanding Medicaid's billing protocols. Those protocols measured time of treatment in units of fifteen minutes. Wheeler claimed that she thought each unit was a single minute, not fifteen. Stressing that the Center was poorly managed and disorganized, she asserted that her oversight of this detail was understandable.

The jury returned guilty verdicts against Wheeler on all counts. She moved for acquittal, arguing that the government had offered insufficient evidence of intent, and for a new trial, contending that some of the statements and argument at trial had impermissibly prejudiced her. The district court denied Wheeler's motions and sentenced her to concurrent sentences of seventy-five months' imprisonment on the healthcare fraud

count and sixty months on the false statements counts. The court also ordered restitution to Medicaid of the approximately $3.1 million paid on bills for massage therapy.

Wheeler appeals, asserting various evidentiary and sentencing errors by the district court. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

II

Wheeler challenges four of the district court's evidentiary rulings. We affirm each under an abuse of discretion standard. *See United States v. Foster*, 557 F.3d 650, 654-55 (D.C. Cir. 2009) (evidentiary rulings are reviewed for abuse of discretion); *United States v. Lin*, 101 F.3d 760, 767-68 (D.C. Cir. 1996).

A

Wheeler argues that the limitations the district court placed on the cross-examination of Health and Human Services investigator Latonya Coates violated the Confrontation Clause of the Sixth Amendment. We disagree.

On direct examination, Coates testified that she had reviewed all of the documents seized from the Center and Wheeler's home and that none of them offered any support for the Medicaid bills listed in the indictment. Before beginning cross-examination, Wheeler's counsel sought the admission of some of the seized documents called "superbills." The record does not reveal who created the superbills or how they were named or used. Nevertheless, Wheeler's counsel argued that the superbills would show that there was support for the bills Wheeler had submitted. But it was not readily apparent to the court how the superbills,

which were confusing on their face, were connected to these bills. The superbills were forms with "superbill" printed at the top. Below spaces for handwritten names and dates, there were printed acronyms, abbreviations, and phrases such as "NMS," "ADL," "Cryo," and "Joint Mobilization." On some of the superbills, handwritten numbers had been entered next to some of these acronyms, abbreviations, and phrases. The district court ruled that Wheeler's counsel could use only those superbills that he could show were tied directly to the bills mentioned in the indictment.

On cross-examination, Coates confirmed that she had reviewed all of the seized files and stood by her testimony that she had seen no documents supporting the bills listed in the indictment. But then she went further, claiming that there was no support for *any* of the bills that the Center had submitted to Medicaid and not just those referred to in the indictment. Seizing upon this expansion of her testimony, Wheeler's lawyer asked the district court to remove the restriction it had placed on his cross-examination, presumably so that he could try to show that some of the superbills were related to Medicaid bills not listed in the indictment. The court refused on the ground that using the superbills might confuse the jury. In line with the cross-examination limitation that the district court had imposed, Wheeler's lawyer showed Coates two superbills that bore the same dates as two of the Medicaid bills specified in the indictment and pointed out to her that some of the handwritten numbers on those superbills could be added together to equal the number of units of treatment billed to Medicaid for those days. Coates acknowledged the possibility that properly understood, the superbills might support the Medicaid bills, but that she could make no sense of them and found them highly confusing. At this point, the court cut off the cross-examination, noting that

Wheeler's counsel was free to put on his own witness to testify about how the superbills were used in billing.

In Wheeler's view, requiring her lawyer to limit his cross-examination of Coates in these ways cut off a line of questioning that would have allowed him to undermine even more fully Coates's testimony. Although Wheeler may be right that cross-examination would have been more effective without these limitations, they did not run afoul of the Confrontation Clause, which is generally satisfied as long as "defense counsel is able to elicit enough information to allow a discriminating appraisal of [a] witness's credibility," *United States v. George*, 532 F.3d 933, 936 (D.C. Cir. 2008) (internal quotation marks omitted), leaving trial judges with broad discretion to impose "reasonable limits" on cross-examination, *see Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "The central question is whether the jury would have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue" the line of questioning disallowed by the district court. *George*, 532 F.3d at 936 (internal quotation marks omitted).

In fact, the cross-examination of Coates was quite effective. Not only was Wheeler's lawyer able to show that the superbills might provide some support for the Center's bills, but he established that Coates did not understand the superbills at all, undermining her testimony that there was nothing in them that was helpful to Wheeler. Additional cross-examination of Coates using other superbills was not needed. The Confrontation Clause does not require a trial court to permit piling on. *See Van Arsdall*, 475 U.S. at 679 ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only

marginally relevant."); *see also George*, 532 F.3d at 935-36. Wheeler contends that additional cross-examination would not have been merely repetitive. It would have allowed her to bolster the story that she mistook "units" for minutes. But she is wrong. As the district court recognized, Wheeler's counsel needed to put on a witness who understood the superbills to prove that story. Coates, who had already conceded that she did not comprehend them, was not that witness.

B

Wheeler also sought to admit the superbills into evidence to show that the errors in the bills she submitted to Medicaid were the result of carelessness, not fraud. Over Wheeler's objection, the district court held that she could only use the superbills as evidence of her state of mind if she first provided a foundation demonstrating that she had actually relied on them in billing. Wheeler argues that the government's stipulation that the superbills were seized during the searches of her home and the Center laid that foundation. But establishing where they were found tells us nothing about whether they were even used in billing. It was no abuse of discretion to require Wheeler to show that the superbills played some part in the creation of the Medicaid bills. *See* FED. R. EVID. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."); *United States v. Burnett*, 890 F.2d 1233, 1240 (D.C. Cir. 1989).

Equally unavailing is Wheeler's suggestion that Coates's testimony that she reviewed the superbills somehow established that they were admissible for all purposes. *Cf.* FED. R. EVID. 105 (contemplating that evidence may be admissible for one purpose without being admissible for all

others). Even though we need not reach this particular argument because Wheeler raised it for the first time in her reply brief, *see Cronin v. FAA*, 73 F.3d 1126, 1134 (D.C. Cir. 1996), we fail to see how Coates's testimony is helpful to Wheeler. Coates never worked at the Center. She knew nothing about the superbills or the manner in which they had been generated, let alone how they might have been used by the Center.

## C

Wheeler faults the district court for refusing to declare a mistrial because of a number of allegedly prejudicial comments made during the trial. We find no abuse of discretion.

Keeping in mind that "[a] mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor," we look at whether the comments were likely to harm the defendant, the steps taken by the court to mitigate that harm, and the likelihood that conviction would have resulted anyway. *Foster*, 557 F.3d at 655 (internal quotation marks omitted); *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998). Even where a comment has the potential to prejudice the defendant, we give significant weight to the district court's decision to provide a "curative instruction" and "normally presume that a jury will follow an instruction to disregard" a prejudicial comment "unless there is an overwhelming probability that the jury will be unable to follow the court's instruction[] and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Foster*, 557 F.3d at 656 (internal quotation marks omitted).

Wheeler first points to a statement from Michael Kirk, the Center's office manager. Kirk testified that Wheeler would frequently submit bills on her computer while he worked nearby. When the prosecutor asked what work Kirk did at the Center, he responded: "Document forgery. Taking checks, scanning them. Wiping information out so that it could be used for whatever purposes [Wheeler] needed it." This accusation of malfeasance was unexpected by the prosecutor and unrelated to the charges Wheeler faced. The prosecutor immediately asked to approach the bench, the court excused the jury, and Wheeler moved for a mistrial. In response to the trial judge's expression of significant displeasure, the prosecutor explained that he had hoped to show by his question that Wheeler alone performed billing activities and that Kirk used his computer for scheduling. Satisfied, the court declined to declare a mistrial. When the jurors returned, the judge told them that she was striking from the record Kirk's comment about document alteration: "[P]ut it out of your mind. It has nothing to do with this case. It's irrelevant. There's no basis for having it be in this case. And that means it can't be thought about, can't be discussed, it's out. You got it?"

Kirk's suggestion that Wheeler was pervasively involved in criminal activities was no doubt potentially prejudicial. *Cf.* FED. R. EVID. 404(b). But the comment was brief, and, viewed in context, less harmful to Wheeler than she maintains. *Cf. United States v. Venable*, 269 F.3d 1086, 1090 (D.C. Cir. 2001) (explaining that the prejudicial impact of comments should be assessed in context). Kirk had already testified that Wheeler owed him money, that he was "angry," "hurt," and "upset" with Wheeler because he had "busted [his] butt and . . . [given his] life and [his] marriage to [his] job for her." It was apparent to the jury that Kirk had ample reason to cast Wheeler in a bad light. In fact, Wheeler's

counsel highlighted Kirk's bias during closing argument, contending that he had a strong motive to fabricate his testimony about her. More importantly, the district court immediately struck Kirk's statement from the record and admonished the jury to disregard it in strong terms.

Finally, it is highly unlikely that Kirk's accusation was a significant factor in the jury's determination. Wheeler would have been convicted in any event. The prosecution put on overwhelming evidence that Wheeler alone was responsible for all billing and that many of the bills she submitted to Medicaid were simply false. And her middle-of-the-night plea for help transferring files from the Center to her home added significant circumstantial evidence that she knew a search of the files would show the bills were fraudulent. *Compare United States v. Eccleston*, 961 F.2d 955, 961-62 (D.C. Cir. 1992) (concluding that a mistrial should have been declared where the improperly admitted testimony was the only thing directly tying the defendant to the crime).

Wheeler points next to the prosecutor's closing argument. Referring to the explanation of an expert witness that thirty percent of Medicaid payments come from local taxes and seventy percent from federal taxes, the prosecutor declared, "A hundred percent . . . [came] from hardworking taxpayers." That money, he continued, was "never intended to pay for Jacqueline Wheeler's million-dollar house in Chevy Chase, Maryland," her "purchase [of] beachfront property in . . . Florida," or "employees to go to her house . . . to do her hair, her mother's hair, to cook for her." Defense counsel objected immediately and in a sidebar contended that this line of argument warranted a mistrial. Acknowledging that the comments were a "little inflammatory," the district court did not declare a mistrial, but warned the prosecutor that he "better be careful." The next morning, Wheeler's counsel

announced that he had a curative jury instruction the court should use. The court did so, telling the jury that it was "entirely improper for you to consider the fact that Medicaid is indirectly funded by the taxpayer and I instruct you that you cannot consider this in any way, and the reference in the closing to taxpayers is stricken."

To be sure, the prosecutor's statement posed some risk of inflaming the jurors by suggesting that taxpayers (including, by implication, them) were the victims of Wheeler's fraud. But the district court gave a strong, curative instruction, which we must presume that the jury followed, *Foster*, 557 F.3d at 656, and, once again, the significant evidence of Wheeler's guilt swamped any possible problem the instruction may not have addressed.

D

Wheeler argues that the testimony of Dr. Sheila Jones, a gerontologist who did work at the Center, provides yet another ground to argue that the jury was unfairly prejudiced. For reasons that are unclear, the prosecutor asked Jones a series of questions about the Center's developmentally-disabled patients. Jones testified that the Center was the "custodian" of monthly living stipends Social Security sent directly to the Center as the "representative payee" of these patients. From these funds, the Center took care of the housing and daily living needs of these patients, such as making sure they took their medications and ensuring that their apartments were clean and stocked with food. Apparently wanting to clarify that the Center's use of those funds was not at issue, the district court asked for confirmation from Jones that the money was in fact used for the care of these patients. Unexpectedly, Jones answered "no." Surprised, the court immediately dismissed the jury. To

the parties, the court expressed concern that Jones might have suggested that Wheeler was pocketing the stipends. Jones assured the court that she had no idea how the money was spent. Upon the jury's return, the court instructed the jurors, "there's no suggestion there's been any impropriety regarding any of" the living stipends and cautioned that "the money is not at issue in this case, and I didn't want you to think from my questions that I was raising any problem here."

At the time, Wheeler did not object to the instruction or ask for a mistrial. After the jury returned its verdict, however, Wheeler moved for a new trial, arguing that she was unfairly prejudiced by the cumulative impact of Jones's testimony, Kirk's misstep, and the prosecutor's overreach. The district court denied that motion.

Trial courts enjoy broad discretion in ruling on a motion for a new trial. *See Gaither v. United States*, 413 F.2d 1061, 1078 (D.C. Cir. 1969) (explaining that this discretion extends to both the trial court's "actual decision" and "what [it] considers before making that decision"). Federal Rule of Criminal Procedure 33(a) instructs that "the court *may* vacate any judgment and grant a new trial if the interest of justice so requires." *See* FED. R. CRIM. P. 33(a) (emphasis added). The rules do "not define 'interests of justice'" and "courts have had little success in trying to generalize its meaning." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). We have held that granting a new trial motion is warranted only in those limited circumstances where "a serious miscarriage of justice may have occurred." *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (internal quotation marks omitted).

Once again, as it did in rejecting Wheeler's motions of mistrial, the district court recognized that any improper prejudice from Jones's comments, whether standing alone or

in combination with the others, was cabined by the court's curative instructions and overwhelmed by the evidence of Wheeler's guilt. We see no basis to disturb the district court's discretionary assessment.

III

A

Wheeler's first challenge to her sentence invokes the Double Jeopardy Clause, which she argues the district court violated by sentencing her under separate criminal statutes for the same conduct. Reviewing Wheeler's argument de novo, we uphold the district court's determination. *See United States v. McCallum*, 721 F.3d 706, 709 (D.C. Cir. 2013).

The Double Jeopardy Clause bars a sentencing court from imposing multiple punishments for the same conduct absent clear indication that Congress intended that result. *See Ball v. United States*, 470 U.S. 856, 861 (1985); *United States v. Mahdi*, 598 F.3d 883, 887-89 (D.C. Cir. 2010). In *Blockburger v. United States*, the Supreme Court told us how to determine whether different statutes punish the same conduct. 284 U.S. 299, 304 (1932). We look solely to the statutes, rather than the facts of a particular matter, to see if "each . . . requires proof of a fact which the other does not." *Mahdi*, 598 F.3d at 888 (internal quotation marks omitted); *see United States v. Weathers*, 186 F.3d 948, 954 (D.C. Cir. 1999). If each statute does, neither is a "lesser included offense of the other,"[*] and the Double Jeopardy Clause is no

---

[*] If the elements of one crime (Crime A) "are a subset of the elements" of another crime (Crime B), then Crime A is a lesser included offense of Crime B. *Schmuck v. United States*, 489 U.S. 705, 716 (1989).

bar to sentencing under both, because statutes that require different proof penalize different conduct. *Mahdi*, 598 F.3d at 888; *United States v. McLaughlin*, 164 F.3d 1, 8-9 (D.C. Cir. 1998).

The statutes in Title 18 under which Wheeler was sentenced penalize different conduct. Section 1347 punishes a person who (1) either "knowingly and willfully executes, or attempts to execute, a scheme or artifice . . . in connection with the delivery of or payment for health care . . . services," and (2) does so to defraud a healthcare benefit program. Section 1035 imposes punishment where a person (1) either "falsifies, conceals, or covers up by any trick, scheme, or device a material fact," or "makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document," and (2) does so "knowingly and willfully" in connection with payment for healthcare. Wheeler's argument that § 1035 is a lesser included offense of § 1347 is unpersuasive. Given that § 1347 merely requires an *attempt* to execute a scheme or artifice to defraud, whereas § 1035 requires *actual* falsification or making a false or fraudulent statement, some violations of § 1347 might not be violations of § 1035. Statutes that overlap but retain different elements pose no risk of double jeopardy.

B

In sentencing Wheeler, the district court applied the enhancement in the Sentencing Guidelines for those who abuse a position of trust. *See* U.S.S.G. § 3B1.3. Wheeler contends that those who submit bills to Medicaid do not occupy such a position. But because she never raised that argument before the district court, our review is limited to assessing whether the district court committed a "clear or

obvious" error. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *United States v. Burroughs*, 613 F.3d 233, 240-41 (D.C. Cir. 2010).

This court has not yet considered whether those who seek payment from the government for the provision of medical services occupy positions of trust vis-à-vis the government, but the majority of circuits that have considered the issue have held they do. *See United States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir. 2000); *United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir. 1998); *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995); *cf. United States v. Hodge*, 259 F.3d 549, 555-57 (6th Cir. 2001) (applying enhancement for fraudulent billing of a non-governmental medical insurer); *United States v. Sherman*, 160 F.3d 967, 970-71 (3d Cir. 1998) (same); *United States v. Iloani*, 143 F.3d 921, 923 (5th Cir. 1998) (same). *But see United States v. Garrison*, 133 F.3d 831, 837-42 (11th Cir. 1998) (concluding such individuals do not occupy positions of trust vis-à-vis the government). Taking no view on the merits of the matter because it was not properly preserved, we conclude that the district court did not commit a clear or obvious error by ruling in a manner that was consistent with this majority rule. *Cf. United States v. Andrews*, 532 F.3d 900, 909 (D.C. Cir. 2008) (finding the absence of plain error partly because of a circuit split on the issue).

C

Wheeler challenges the district court's order to forfeit $3,168,559.28, the amount Medicaid paid the Center for massage therapy between January 2006 and April 2008. She argues that any forfeiture should have been limited to $482,161.92, the amount Medicaid paid on the bills set forth

in the indictment. Wheeler did not raise this objection below, however, and we see no plain error in the district court's forfeiture and restitution awards. Wheeler also argues that the district court erred in calculating her Guidelines offense level using $3,168,559.28, rather than $482,161.92, as the loss amount. But Wheeler had urged the district court to "find that the loss amount is greater than $2.5 million and less than $7 million." Doing so, she lost her opportunity to assert a *different* amount on appeal. A litigant cannot exploit an error on appeal that she invited the district court to commit. *See United States v. Harrison*, 103 F.3d 986, 992 (D.C. Cir. 1997). Even Wheeler tacitly concedes the point. Her reply brief offers no response to the government's assertion that she waived this argument.

## IV

Because all of Wheeler's attacks on her conviction and sentence lack merit, we affirm.